(No. 39032.—

BOARD OF EDUCATION OF COMMUNITY UNIT SCHOOL DISTRICT No. 2, Appellant, *vs.* DORIS REDDING *et al.,* Appellees.

*Opinion filed May 20, 1965.*

WAGNER, CONNOR, FERGUSON, BERTRAND & BAKER, of East St. Louis, for appellant.

WILLIAM K. CAVANAGH, of Springfield, for appellees.

Mr. JUSTICE DAILY delivered the opinion of the court:

This action in chancery was brought in the circuit court of Bond County by plaintiff, the Board of Education of Community Unit School District No. 2 of said county, to enjoin defendants from conducting a strike against the

board and from picketing its schools in support of such strike. The named defendants were a national union, its local counterpart, officials of the local, and thirteen members of the union who had been custodial employees of the board. After a hearing, the trial court denied injunctive relief and dismissed the complaint. Plaintiff has appealed directly to this court since questions arising under the State and Federal constitutions are involved. More specifically, it is the contention of plaintiff that the strike and picketing interfere with the constitutional duty of our General Assembly to "provide a thorough and efficient system of free schools," (const. of 1870, art. VIII, sec. 1,) whereas defendants assert the picketing complained of is a valid exercise of free speech under the State and Federal constitutions.

Although the legal issues presented are narrow and well defined, we believe a consideration of those issues requires a statement in some detail of the facts surrounding the controversy. The plaintiff, duly and lawfully organized under the laws of Illinois, operates seven attendance centers, consisting of three grade schools, a junior high school and a senior high school in Greenville, and grade schools in Pocahontas and Sorento. It has approximately 2500 students enrolled at the seven centers, and employs 153 teachers and other personnel. Prior to September 2, 1964, its custodial force consisted of 13 employees, all of whom are defendants in this suit. The latter employees had joined or became affiliated with a local and national "Teamsters, Chauffeurs and Helpers" union and, on August 3, 1964, union officers presented to the plaintiff-board a proposed collective bargaining agreement on behalf of the thirteen employees. Plaintiff refused to sign the agreement for various reasons, the validity or propriety of which form no part of the issues in this proceeding.

On September 2, 1964, a regularly scheduled school day, the thirteen custodial employees did not report for work,

but, with the help and financial support of the union, set up picket lines at each of the seven attendance centers. These lines have been maintained at all times pertinent to the case, and it appears that the picketing has been peaceful. In addition, there is no showing in the record that any of the defendants coerced or advised any persons not to cross the picket lines. The pickets carried and paraded with signs, the exact wording of which does not appear in the record; however, as recalled by witnesses, the placards stated in substance that members of "Teamsters Local No. 525" were "on strike" against "Bond County Unit District No. 2."

During the next eight days, except for nonschool days, normal school operations were disrupted as follows: (1) attendance figures were abnormally low, a circumstance which could indirectly affect State aid plaintiff would get on the basis of daily attendance averages; (2) milk and bread deliveries, as well as the deliveries of surplus foods, were not made to the school cafeterias when deliverymen would not cross the picket lines; (3) schools were not cleaned and no personnel were available for such cleaning; (4) the employees of a roofing contractor refused to cross the picket line to complete repairs on a leak in a school roof; (5) the transportation of pupils to schools was affected; and (6) the board closed the schools completely from September 8 through 10.

The complaint for injunctive relief was filed September 8 and, on such date, it appears that local union officials dispatched a telegram to plaintiff stating that the striking employees would "maintain essential sanitary services" upon request, but no such request was made. On September 10, a hearing was had on a motion by plaintiff for a preliminary injunction but such relief was not granted. Instead, the court issued a statement "for full circulation and publicity," the gist of which was that it was the desire of both sides to the litigation that the schools reopen on September 11 and remain open until the case was heard; that both parties and

the court encouraged the full attendance of students and teachers; that the plaintiff would order school buses to operate and that defendants had agreed not to interfere with their operation; that defendants could, in the meantime, continue peaceful picketing; and that the court recommended "efforts at friendly solution." Hearing on the complaint was set for September 24.

Between September 11 and 24 the picketing continued and the schools operated, but with the following deviations from normal: (1) cleaning was done by volunteers and temporary replacements but the cleanliness of the buildings was below standard; (2) no personnel were available to fire furnaces or operate hot water systems; (3) physical education classes had to be curtailed in the junior high school due to lack of hot water; (4) it became necessary to buy a new type water heater for one of the cafeterias in order for dishes to be washed; and (5) principals and other supervisory personnel were forced to perform many duties aside from their regular educational duties. As we interpret the record, union officials advised deliverymen they could cross the picket line if they chose and the delivery of milk and bread was resumed. Some drivers delivering other supplies, however, chose to honor the picket lines, and school personnel used their own cars to go to warehouses for essential supplies. The employees of the roofing contractor continued their refusal to cross the line and, during and after rains, the leak in the roof became worse and plaster fell from the ceiling. Vandalism occurred in one of the schools over a weekend, but there is no showing that it occurred at a time when the regular custodial personnel would have been present.

The trial court refused to enjoin either the strike or the picketing, and its·order dismissing the complaint found that plaintiff had failed to show irreparable injury, that the picketing was peaceful and a valid exercise of the constitutional rights of free speech, and that there was no danger

of interference with the operations of the schools. And while there is some effort to divert us to a determination of whether public school employees may lawfully organize into unions at all, (see: *People ex rel. Fursman* v. *City of Chicago,* 278 Ill. 318,) that issue was not raised or passed upon below. Rather, the scope of our review is limited to a consideration of whether such employees may strike against their school board employer, and whether they may picket to support their strike.

Although this is a case of first impression in a reviewing court of this jurisdiction, it is, so far as we can ascertain, the universal view that there is no inherent right in municipal employees to strike against their governmental employer, whether Federal, State, or a political subdivision thereof, and that a strike of municipal employees for any purpose is illegal. (*E.g. City of Manchester* v. *Manchester Teachers Guild,* 100 N.H. 507, 131 A. 2d 59; *City of Pawtucket* v. *Pawtucket Teachers' Alliance,* 87 R.I. 364, 141 A. 2d 624; *Norwalk Teachers Assn.* v. *Board of Education,* 138 Conn. 269, 83 A. 2d 482; *International Brotherhood of Electrical Workers* v. *Grand River Dam Authority,* —— Okla. ——, 292 P.2d 1018; *City of Alcoa* v. *International Brotherhood of Electrical Workers,* 203 Tenn. 12, 308 S.W.2d 476; *Port of Seattle* v. *International Longshoremen's & Warehousemen,* 52 Wash. 2d 317, 324 P.2d 1099; *Donevero* v. *Jersey City Incinerator Authority,* 75 N.J. Super. 217, 182 A. 2d 596; *South Atlantic et al.,* v. *Harris County-Houston et al.,* —— Texas ——, 358 S.W.2d 658; *Petrucci* v. *Hogan,* 27 N.Y.S. 2d 718; *City of Los Angeles* v. *Los Angeles Building and Construction Trades Council,* 94 Cal. App. 2d 36, 210 P.2d 305; *City of Detroit* v. *Division 26 of Amalgamated Ass'n,* 332 Mich. 237, 51 N.W.2d 228; 31 A.L.R.2d 1141; U. of Ill. Law Forum, Fall 1961, p. 377, Strayhorn, "Municipal Employees and the Law;" 41 Ill. Bar. Jour. 432, Sullivan, "Labor Problems in Public Employment.") The underlying basis for

the policy against strikes by public employees is the sound and demanding notion that governmental functions may not be impeded or obstructed, as well as the concept that the profit motive, inherent in the principle of free enterprise, is absent in the governmental function.

So far as the application of the policy to school employees is concerned, we are persuaded by the reasoning of the court in the *City of Pawtucket* case (141 A. 2d at 627-628) where it was said: "Under the provisions of article XII of the state constitution education is a state function. As such it is administered and carried out by the cities and towns, through their school committees, as agencies of the state government by virtue of legislation enacted pursuant to said article XII. * * * The teachers who were involved in the strike in the instant case are, therefore, agents of the state government and as such exercise a portion of the sovereign power. * * * it has been generally held that persons exercising a portion of the sovereign power have no right to strike against the government, be it federal, state or a political subdivision thereof." Our own constitution impresses the General Assembly with the duty to "provide a thorough and efficient system of free schools," (const. of 1870, art. VIII, sec. 1,) and we believe it logically follows that those who, under the implementing statutes, become the agents to fulfill the will of the people in such respect are themselves charged with a duty to refrain from conduct which will render our schools less efficient and thorough. The drastic remedy of organized strikes against employing school boards is in direct contravention of such duty.

In the briefs filed in this court defendants have neither sought to defend the legality of the strike in this case, nor to answer the authorities and charges of plaintiff concerning its illegality, and have further weakened their position on this issue by a concession in oral argument that it would be unlawful for teachers to strike. But we see no compelling

difference, except possibly one of degree, between striking teachers and striking custodial employees, measured in terms of the constitutional mandate that our schools be thorough and efficient. The physical plant and its proper maintenance are important adjuncts in furnishing education. Heat, sanitation, proper building repair, the regular attendance of pupils, keeping within budgetary and tax limits, and keeping teaching and administrative personnel free from matters which distract them from their educational tasks, are all matters which are essential to the efficient operation of a school and to the fulfillment of its paramount purpose of educating the children of this State. Also, due to the very nature of the community unit district, providing transportation and lunch for the pupils has become an integral part of the educational scheme by which the commands of the constitution are met. The uncontroverted proof in the record here shows that the normal functioning of plaintiff's schools has been impeded and obstructed by the strike in all of these respects, and serves to demonstrate the wisdom of the majority rule that a strike by public employees is illegal.

We detect in defendants' arguments a suggestion that legal sanction should be given to the strike in this case because the striking employees offered to perform essential sanitary services, because the union has given deliverymen permission to cross the picket line, and because those individuals who still refuse to cross the picket line do so of their own volition rather than through active coercion on the part of defendants. These circumstances, however, can be of little consequence, for the fact remains that an important governmental function is nonetheless still being impeded and adversely affected as a result of the strike. What is more, to be thorough and efficient, school operations cannot depend upon the choice or whim of its employees, or their union, or others, but must necessarily be controlled only by duly constituted and qualified school officials. Ac-

cordingly, and in conformity with the vast weight of authority, it is our opinion that the trial court erred in its refusal to enjoin the strike.

Turning to the matter of picketing, which the trial court also refused to restrain, it is the position of defendants, and was apparently that of the trial court, that the right of working men to communicate their complaints by peaceful picketing is completely inviolable. That is to say, defendants insist that picketing is a form of free speech and when done in a peaceful and truthful manner may not otherwise be regulated or enjoined. However, the premise that peaceful picketing is immune from all regulation and control is a false one. While picketing has an ingredient of communication, the cases make it clear that it cannot be dogmatically equated with constitutionally protected freedom of speech, and that picketing is more than free speech because picket lines are designed to exert, and do exert, influences which produce actions and consequences different from other modes of communication. (*Hughes* v. *Superior Court of California,* 339 U.S. 460, 94 L. ed. 985; *International Brotherhood of Teamsters, Local 309,* v. *Hanke,* 339 U.S. 470, 94 L. ed. 995.) Indeed, these by-products of picketing which go beyond free speech are self-evident in this case. It is now well established that the latter aspects of picketing may be subject to restrictive regulations (*Bakery & Pastry Drivers and Helpers Local 802 of I.B.T.* v. *Wohl,* 315 U.S. 769, 86 L. ed. 1178,) and while the specific situation must control decision, it is more than clear that a State may, without abridging the right of free speech, restrain picketing where such curtailment is necessary to protect the public interest and property rights and where the picketing is for a purpose unlawful under State laws or policies, whether such policies have been expressed by the judicial organ or the legislature of the State. (*Hughes* v. *Superior Court of California,* 339 U.S. 460, 94 L. ed. 985; *International Brotherhood of Teamsters Local 695* v. *Vogt, Inc.*

354 U.S. 284, 1 L. ed. 2d 1347; *Building Service Employees International Union, Local 262* v. *Gazzam,* 339 U.S. 532, 94 L. ed. 1045; *Montgomery Ward & Co.* v. *United Retail, Wholesale & Department Store Employees,* 400 Ill. 38; *Austin Congress Corp. v. Mannina,* 46 Ill. App.2d 192.) As stated by the late Mr. Justice Frankfurter in the *Hughes* case: "It has been amply recognized that picketing, not being the equivalent of speech as a matter of fact, is not its inevitable legal equivalent. Picketing is not beyond the control of a State if the manner in which picketing is conducted or the purpose which it seeks to effectuate gives ground for its disallowance. * * * 'A state is not required to tolerate in all places and all circumstances even peaceful picketing by an individual.' " 339 U.S. at 465-466, 94 L. ed. at 992.

The picketing here, though peaceful, was for the purpose of fostering and supporting an unlawful strike against a governmental employer and, being for an unlawful purpose, should have been enjoined for this reason alone. Apart from this, however, the effect of the influences exerted by the picketing was to impede and obstruct a vital and important governmental function—the proper and efficient education of our children—making its curtailment necessary to protect the patently overiding public interest.

Nor is our conclusion altered by *City of West Frankfort* v. *United Association of Journeymen and Apprentices, Local* 551, 53 Ill. App. 2d 207, upon which defendants chiefly rely. The picketing there was not directed to or in furtherance of an unlawful purpose, but was for the dual purpose of communicating that the city was not employing union plumbers on a particular project of a municipally owned water utility, and to "invite employees" to join the plumbers' union. Furthermore, in holding that the peaceful picketing was constitutionally protected free speech, the court appears neither to have recognized that picketing is something more than a mode of communication, nor to have weighed the public interests affected. In like manner, de-

fendants are not aided by abstract quotations lifted at random from two cases of the same name, *viz.*, *Cox* v. *Louisiana*, 379 U.S. 536, 13 L. ed. 2d 471, and 379 U.S. 559, 13 L. ed. 2d 487. While the opinions do reaffirm many of the constitutional principles of free speech, at the same time they expressly reaffirm the principle that the "First and Fourteenth Amendments do not afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching and picketing * * *," and recognize that some aspects of picketing may justify State regulation. The substantial holding of each case was, however, that the State regulation involved was too broad, indefinite and vague, and therefore resulted in unwarranted abridgements of the constitutional right of freedom of speech. There is no parallel or analogy in the instant case.

For the reasons stated, the order of the circuit court of Bond County dismissing plaintiff's complaint is reversed, and the cause is remanded to that court with directions to enter a decree granting the injunctive relief prayed in conformity with the views expressed herein.

*Reversed and remanded, with directions.*