Chicago Division of the Illinois Education Association, an Illinois Not-For-Profit Corporation, a/k/a Chicago Education Association, Plaintiff-Appellant, and James D. Broman, Individually as a Taxpayer and in Behalf of All Other Taxpayers Similarly Situated, Intervenor-Plaintiff-Appellant, v. Board of Education of The City of Chicago, Defendant-Appellee, and John M. Fewkes, et al., as Officers of the Chicago Teachers Union, Intervenor-Defendants-Appellees.

Gen. No. 51,378.

First District, First Division.

November 9, 1966.

Goldberg, Weigle, Mallin & Rivkin, of Chicago (Irving H. Goldberg, David Parson, Theodore P. Fields, John

Hudson and Darryl M. Fohrman, of counsel), for plaintiff-appellant.

Frank F. Fowle, Edward B. Miller, Roy S. Kullby and Patrick Hardin, of Chicago (Pope, Ballard, Uriell, Kennedy, Shepard & Fowle, of counsel), for intervenor-plaintiff-appellant.

Kirkland, Ellis, Hodson, Chaffetz & Masters, of Chicago (Thomas F. Scully, of counsel), for defendant-appellee.

Ligtenberg, Goebel & De Jong, of Chicago (John Ligtenberg and Andrew Leahy, of counsel), for intervenor-defendants-appellees.

MR. JUSTICE MURPHY delivered the opinion of the court.

Plaintiff and intervenor-plaintiff appeal from an "Opinion and Decree," which dismissed their separate complaints, after making findings and declarations of law, the effect of which was to approve collective bargaining by the Board of Education of the City of Chicago with a sole collective bargaining agency to be selected by its teachers.

The plaintiff (Chicago Division), an Illinois not-for-profit corporation, is an association of school teachers and other educational personnel organized for the purpose of representing its members and other teachers and educational personnel who desire it to present grievances to, and negotiate with, the defendant Board of Education of the City of Chicago (Board), regarding working conditions, welfare and professional responsibilities. The intervenor-plaintiff is James D. Broman, a citizen and taxpayer of the City of Chicago.

The intervenor-defendant, the Chicago Teachers Union (CTU), is an unincorporated association in the nature of a labor union or labor organization. Its members, also, are teachers and educational personnel employed by the defendant Board of Education. It is alleged that CTU has "about 12,000 members who are active classroom teachers in the schools of Chicago."

Since 1964, the Board has recognized the Chicago Division, the CTU and the Chicago Principals Club as collective bargaining agents for their teacher members and other educational personnel who desired one of these organizations to speak for them. With the Board's approval, a "Memorandum of Understanding," which prescribed procedures for the resolution of professional problems and grievances, was entered into with each organization by the General Superintendent of Schools.

In a verified two-count complaint filed October 5, 1965, plaintiff sought (1) both a declaratory judgment to have its "Memorandum of Understanding" (contract) with the defendant Board, dated March 11, 1964, and effective November 12, 1964, determined to be a valid and subsisting contract, in force and effect at least until November 12, 1966, and to restrain the Board "from proceeding with the preparation for and the conducting of the election among its employees, school teachers and educational personnel to determine what organization they wish to have represent them as their sole bargaining agent until a hearing and determination of this cause be had by this Court"; and (2) relief against the "Board's adoption of Resolutions 73408 and 73409 in September, 1965," which resolutions plaintiff claimed breached its contract; and relief against the Board's discrimination reflected by the Board's activities leading up to the adoption of the resolutions and its continued demonstrated prejudicial action thereafter against plaintiff and in favor of Chicago Teachers Union.

The intervenor-plaintiff, James D. Broman, filed a complaint in which he alleged that "as a result of threats and intimidation by the intervenor-defendant, the Chicago Teachers Union, unlawfully to disrupt the operation of the school system by causing an illegal strike of its members, and in unlawful agreement with the Chicago Teachers Union, the Board of Education has engaged in and embarked upon a course of conduct which has required and will require that the Board perform acts not authorized by The School Code or by any other statute of the State of Illinois, and which acts are and will be contrary to the laws and public policy of the State of Illinois and which constitute an abdication and illegal sharing and delegation of their duties as public officials . . . ." Injunctive relief was sought, temporary and permanent, restraining the Board from recognizing CTU, or any organization, as the sole bargaining agent or as a collective bargaining agent for its employees "upon any question upon which power of decision has been entrusted to the said Board of Education by the Illinois State Legislature." Other relief sought included restraint of the Board from "authorizing or holding a referendum or any other kind of election for the purpose of selecting a sole bargaining agent."

Defendant Board and intervenor-defendant CTU filed motions to strike and dismiss the complaints of the Chicago Division and of Broman.

On February 23, 1966, the trial court, after considering the pleadings, affidavits and exhibits, and the briefs filed by all parties, and having heard the arguments of counsel, entered an "Opinion and Decree," which included findings and declarations of law, allowed the motions to strike and dismiss both complaints, and dismissed the cause subject to expressed "limitations."

The findings included:

"2. The Memorandum of Understanding entered into between Chicago Division of the Illinois Educa-

459

tion Association and the General Superintendent of Schools and adopted by the Board of Education of the City of Chicago November 12, 1964 is a valid agreement, subsisting until terminated by either of the parties thereto, or by the Board of Education of the City of Chicago, after notice given the other party prior to October 1 of any year that it will be modified or terminated November 12 of that year."

. . . . . .

"4.  Board Resolution No. 73409 of September 23, 1965 authorizes the teachers employed by the Board of Education of the City of Chicago to hold a referendum election at which they may select a sole collective bargaining agent concerning wages, working conditions, fringe benefits, and other professional problems; and provides that regardless of the outcome of the election any teacher may join any employee organization of his own choosing and that persons not members of the organization selected at the election have the right to present grievances and submit suggestions to the Board as individuals."

The order included:

"2.  Board Resolution No. 73408, insofar as it provides:

" '. . . that the Board of Education agrees to incorporate in the collective bargaining agreement a provision that on any and all matters which are proper subjects of collective bargaining, which are brought to the attention of the Board of Education or school administration by any individual or organization, the Union shall be informed, and any action or decision on the matter shall be made only after negotiation with the Union,'

460

is without force or effect.

"3.  Board Resolution No. 73409 is lawful and is not a delegation, dilution, or sharing of powers delegated to the Board of Education of the City of Chicago by the General Assembly; however, that Resolution may not be effectuated until notice of intent to terminate the existing Memoranda of Understanding has been given by the Board of Education to the other parties thereto.

"4.  Any collective bargaining agreement which the Board of Education of the City of Chicago may enter into with an agency representing its teachers or other educational personnel, whether or not with a sole collective bargaining agency selected by its teachers, shall contain specific provisions whereby the employee organization shall agree not to strike, not to picket in any manner which would tend to disrupt the operation of any public school in the City of Chicago or of the administrative offices of the Board of Education of the City of Chicago, that the benefit of any and all decisions and conclusions the Board of Education may reach after having negotiated with the employee organization selected shall apply equally to all teachers and other educational personnel employed by the Board of Education; and that, should negotiations fail to resolve differences, the decision of the Board of Education shall be final.

"5.  Subject to the limitations hereinabove expressed, the motions to strike the complaint as amended of Chicago Division of the Illinois Education Association and the complaint of James D. Broman are allowed, and the complaint as amended of Chicago Division of the Illinois Education Association and the complaint of James D. Broman are hereby stricken and the cause dismissed."

461

The plaintiff and intervenor-plaintiff Broman both appealed from the decree and filed separate briefs asserting different grounds to show that the lower court was in error in entering the decree and in not issuing restraining orders.

The record of proceedings in this court shows that subsequent to the entry of the decree and on March 25, 1966, the Board gave written notice of intent to terminate the "Memoranda of Understanding" of both plaintiff and the Chicago Teachers Union and authorized a referendum election to be held on May 27, 1966. Thereafter, this court denied plaintiff's motion for a temporary restraining order enjoining the holding of the election.

Initially, we consider whether the trial court was correct in striking Broman's complaint. This raises the basic question of whether the Board may bargain collectively with an exclusive employee representative. Broman contends:

(1) "The central question raised in this Court is whether the Board of Education of the City of Chicago has authority to engage in collective bargaining, and to enter into a collective bargaining agreement, with an exclusive representative of its employees. It is not disputed that the power to do so has not been expressly conferred on the Board by the legislature. Both defendants have argued, rather, that the authority to engage in such bargaining, and to conclude a contract, may be implied from general legislation empowering the Board to contract and to do all things 'necessary or proper' for the operation of the schools. Neither defendant has argued that the authority to bargain collectively is *necessary* to the operation of the schools. Instead, both have argued that collective bargaining is a *proper* function of the Board, and may be engaged in by the Board at its discretion."

(2) "The courts of this state—like those in a majority of other jurisdictions—should leave to the legis-

lature the many policy questions presented by the question of whether, and under what restrictions and conditions, the institution of collective bargaining should be imported into the public sector."

The authorities cited by Broman include International Brotherhood v. Grand River Dam Authority (Okla), 292 P2d 1018 (1956) which, Broman asserts, stands for the proposition "that public employees have no common law right of collective bargaining, and that even a statute giving a public agency authority to contract does not, inferentially, create in public employees the *right* to bargain collectively." City of Jackson v. McLeod, 199 Miss 161, 24 So2d 319 (1946), which was a suit by a policeman who had been discharged because of his membership in a labor union. There the court upheld the Civil Service Commission in its finding that union membership was incompatible with a policeman's duty to the community. Levasseur v. Wheeldon, 79 SD 442, 112 NW 2d 894 (1962), cited for the rule that "absent statute public employees have no right to engage in collective bargaining." Philadelphia Teachers' Ass'n v. Labrum, 415 Pa 212, 203 A2d 34 (1964) cited to suggest that "Pennsylvania law does not uphold collective bargaining between public employees and public employers." Mugford v. Mayor and City Council of Baltimore, 185 Md 266, 44 A2d 745 (1946), where "the precise question of a municipality's authority to bargain collectively with its employees was decided negatively by the trial court and not appealed." International Union of Operating Engineers, Local Union No. 321 v. Water Works Board of City of Birmingham, 276 Ala 462, 163 So2d 619 (1964), which followed "the strongest current of opinion from the highest courts of states where the question has been presented . . . that a public agency has no authority to bargain or contract with a labor union in the absence of express statutory authority." International Long-

shoremen's Ass'n, AFL–CIO v. Georgia Ports Authority, 217 Ga 712, 124 SE2d 733 (1962), which holds that picketing by public employees for bargaining rights is enjoinable because it contravenes the public policy denying public employers the authority to bargain. Wichita Public Schools Employees Union, Local 513 v. Smith, 194 Kan 2, 397 P2d 357 (1964), "where the court held that the state's general legislation conferring collective bargaining rights did not extend to governmental employees." Delaware River & Bay Authority v. International Organization, 45 NJ 138, 211 A2d 789 (1965), where, "in appealing an order enjoining it from picketing or striking, a union of Bay Authority employees argued that the constituent compacts' *general* conferral of power to contract empowered the Authority to enter into *collective bargaining contracts*. The court rejected that argument on grounds that the power to enter collective bargaining contracts would be contrary to established state policy. The court ruled . . . that a change in that policy required action by the legislature."

From these authorities, Broman argues that since 1958 the courts of nine states have reiterated the basic principle contended for by taxpayer Broman—that public employees have no right to bargain collectively unless and until the legislature has conferred that right and defined the manner of its exercise. As evidence of an Illinois policy against collective bargaining by public employees, Broman points out that "the legislature has ten times refused *general* authorization for public collective bargaining but has, during the same period, authorized collective bargaining for two specified public agencies." Broman argues that the Illinois Supreme Court in Board of Education of Community Unit School Dist. No. 2 v. Redding, 32 Ill2d 567, 207 NE2d 427 (1965), recognized and explicitly relied upon the fundamental distinction between public and private employment in ruling

that public employees could not engage in concerted refusals to work or disruptive picketing. He asserts that neither the Illinois Labor Peace Act, Ill Rev Stats, c 10, §§ 20–30, nor the Illinois Anti-Injunction Act, Ill Rev Stats, c 48, § 2a, are applicable to public employment. These manifestations of public policy, he concludes, evidence both legislative and judicial intent not to authorize or permit collective bargaining in public employment.

The Board contends that specific legislation is unnecessary, and that existing general legislation is more than sufficient to authorize exclusive collective bargaining by the Board, and that the collective bargaining agreement authorized by the decree preserves the Board's statutory authority and that its provisions are mandatory. It argues that Broman's authorities are not relevant, and that "few of these foreign authorities considered any specific collective bargaining agreement, not to say one containing provisions similar to those required to be included in any collective bargaining agreement the Board may enter."

The Board asserts that "a review of the activity of state and the federal legislatures can be argued to demonstrate that legislation is needed to prevent collective bargaining by governmental agencies, not to authorize it," and that existing Illinois legislation authorizes collective bargaining by the Board. Ill Rev Stats 1965, c 102, § 35.2, and c 48, § 852. The Board claims that the power of the Board here questioned "exists independently of *specific* statutory provisions and is legislatively recognized by the cited Acts." It agrees that Article 34 of the School Code, which governs school boards, does not specifically authorize the Board to engage in collective bargaining, but neither does it "provide otherwise."

As to the general rule set forth in 31 ALR2d 1142, 1170:

> "Public employers cannot abdicate or bargain away
> their continuing legislative discretion and are there-
> fore not authorized to enter into collective bargain-
> ing agreements with public employee labor unions,"

the Board states that "the decree at bar prohibits the
Board from entering into any collective bargaining agree-
ment under which it would 'abdicate or bargain away its
continuing legislative discretion'. Such a collective bar-
gaining agreement cuts the ground from under the gen-
eral rule as stated in American Law Reports. The *reason*
for the rule being absent, there is *no* reason for it here."

The Board further agrees that it cannot delegate au-
thority conferred on it by the legislature, nor delegate
its discretionary powers in any collective bargaining
agreement (Stroh v. Casner, 201 Ill App 281 (1916)), but
claims that Broman's assertion that "collective bargain-
ing *necessarily* grants to the collective bargaining agent
a role in the decision-making process of the Board which
was neither created nor approved by the legislature," ig-
nores the provisions of the instant decree. The Board
points out that under the decree it must maintain "sole
responsibility for effecting the statutory duties delegated
to it," and that the decree "prohibits the Board's entry
into *any* collective bargaining agreement which could
result in any delegation of its statutory powers or duties."

The Board contends that the decree is in accord with
the Illinois Supreme Court opinion in Board of Education
of Community Unit School Dist. No. 2 v. Redding, 32
Ill2d 567, 207 NE2d 427 (1965) and that Redding does
not speak of the legality of collective bargaining by pub-
lic school employees. Rather, it holds only that such
employees cannot strike or otherwise engage in conduct
deleterious to the efficient operation of the schools. In
the Redding case, where the court enjoined both the strike
and picketing of schools, it is said (p 571):

466

"And while there is some effort to divert us to a determination of whether public school employees may lawfully organize into unions at all, (see: People ex rel. Fursman v. City of Chicago, 278 Ill 318,) that issue was not raised or passed upon below. Rather, the scope of our review is limited to a consideration of whether such employees may strike against their school board employer, and whether they may picket to support their strike.

"Although this is a case of first impression in a reviewing court of this jurisdiction, it is, so far as we can ascertain, the universal view that there is no inherent right in municipal employees to strike against their governmental employer, whether Federal, State, or a political subdivision thereof, and that a strike of municipal employees for any purpose is illegal."

And at p 572:

"Our own constitution impresses the General Assembly with the duty to 'provide a thorough and efficient system of free schools,' (const of 1870, art VIII, sec 1), and we believe it logically follows that those who, under the implementing statutes, become the agents to fulfill the will of the people in such respect are themselves charged with a duty to refrain from conduct which will render our schools less efficient and thorough. The drastic remedy of organized strikes against employing school boards is in direct contravention of such duty."

The Board, in support of the decree and its provisions, asserts that it "accords with the pronouncements of all relevant precedent in or out of this State," and that "the collective bargaining agreement held lawful by the chancellor cannot conceivably serve as a vehicle for delegat-

467

ing legislative power." The Board argues that the "propriety and mandatory nature of the entire Decree is established by judicial pronouncement . . . :

> " 'The rules of courts of chancery in granting relief are flexible, such court not being bound by formulas or restrained by any limitation which tends to trammel the free exercise of discretion. When all the parties are before the court, the whole case may be considered, all interests protected, and a complete decree made which will be binding on all parties who have a substantial beneficial interest in the litigation.' 7 ILP 582; DuPage County v. Henderson, 402 Ill 179; McMechan v. Yenter, 301 Ill 508,"

and that a decree of a court of equity must be reasonably construed, and must be interpreted as an entirety. Neidhardt v. Frank, 325 Ill 596, 156 NE 769 (1927).

On the issue of collective bargaining in public employment, the intervenor-defendant, CTU, contends that "employees, including those employed by government, have a right to organize for the purpose of collective bargaining under the First and Fourteenth Amendments to the United States Constitution," and that the right of employees to organize has been treated in several U. S. Supreme Court cases as protected by the Constitution. Lincoln Union v. Northwestern Co., 335 US 525 (1949); Communications Ass'n v. Douds, 339 US 382 (1950).

Other authorities relied on include City of Springfield v. Clouse, 356 Mo 1239, 206 SW2d 539, 542 (1947), where it is said:

> "All citizens have the right, preserved by the First Amendment to the United States Constitution . . . to peaceably assemble and organize for any proper purpose . . . ."

International Union, United Automobile Workers v. Wisconsin Employment Relations Board, 336 US 245 (1949), where it is said (p 259):

> "The right to strike, because of its more serious impact upon the public interest, is more vulnerable to regulation than the right to organize and select representatives for lawful purposes of collective bargaining which this Court has characterized as a 'fundamental right' . . . ."

Labor Board v. Jones & Laughlin, 301 US 1 (1937), where the Supreme Court upheld the validity of the National Labor Relations Act and pointed out that the Act was designed to "protect" the right to organize and the right to organize included the right to organize for the purpose of collective bargaining, which right existed separate from the Act.

The CTU, in asserting that the right of employees to organize for collective bargaining is a right also enjoyed by public employees, states, "employment by government does present the occasion for limitation of rights, but until government actually attempts to limit rights they remain unfettered," Wieman v. Updegraff, 344 US 183 (1952); United Public Workers v. Mitchell, 330 US 75 (1947), and "while Taxpayer Broman seemingly assumes that by entering public service employees thereby cede all their rights and have only those which the government gives, the exact opposite is true. Thus public employees in Illinois maintain their right to organize for the purpose of collective bargaining, at least until that right is legitimately limited," and "the proper question then is whether the instant Board of Education is under some legal inhibition."

In contending that Illinois belongs among those states which approve collective bargaining in public employment, the CTU admits there is a genuine split on this

469

issue existing in this country, and that the list of fourteen states submitted by Broman appears to be formidable, but argues, "it loses much of its impressiveness when subjected to analysis," and that the "jurisdictions he can reliably cite are only Alabama, Colorado, Georgia, Kansas, Missouri, New Jersey and Tennessee."

As additional authority, the CTU states that "New York City and 86 unions representing the various employees of the city established a Memorandum of Understanding dated March 31, 1966, which includes the following provisions:

" 'Collective bargaining is the most effective means in our society for matching employer requirements with employee needs. A healthy bargaining relationship provides the maximum promise that labor-management disputes will be resolved by peaceful measures, to the great advantage of the disputants and, in the case of public employment, to the even more important advantage of the public . . . .

" 'It is the policy of the City of New York to engage in collective bargaining and enter into written agreements with employee organizations . . . .'

"But the City of New York is not alone. The Board of Education in that city has an exclusive bargaining agreement with the United Federation of Teachers which represents some 44,000 teachers. . . . New York, Pennsylvania and Connecticut are but three among many jurisdictions where local governmental bodies have adopted policies favoring collective bargaining."

The CTU notes that "The American Federation of Teachers, of which the Chicago Teachers Union is a local, represents teachers in Philadelphia, New York, Detroit, Cleveland and numerous smaller cities and communities. Illinois locals currently have written exclusive collective

470

bargaining agreements in Cicero, Maywood, and Proviso school districts. Proviso and East St. Louis were among the very first school boards in the United States authorizing collective bargaining elections. Within the last several months, school boards in Kankakee, Calumet City and Stickney Township have adopted pro collective bargaining policies. . . . Alaska, California, Connecticut, Delaware, Massachusetts, Michigan, Minnesota, New Hampshire, Oregon, Rhode Island, Washington and Wisconsin have by legislative pronouncement demonstrated that collective bargaining is within sound good public policy."

As to whether the Board of Education of the City of Chicago may in its discretion engage in collective bargaining, the CTU observes, "There appears to be no disagreement over the fact defendant Board of Education has the power to employ 20,000 teachers. The central issue of this case lies in disagreement over the means used to determine the contract terms of those 20,000 employees. It is submitted that the board is the best judge of the most efficient method of arriving at those terms; this court is without authority to deny the board's exercise of discretion in choosing the method unless the choice is manifestly unreasonable."

On the exercise of discretion by the Board, the CTU analyzes the various Illinois authorities relied upon by Broman, such as Lindblad v. Board of Education, 221 Ill 261, 77 NE 450 (1906), and Stroh v. Casner, 201 Ill App 281, and asserts that they are not in point.

The CTU argues that the Illinois courts have approved broad discretion in school board contractual relationships which have genuine bargaining as their basis, and cites Wilson v. Board of Education of Chicago, 233 Ill 464, 84 NE 697 (1908), where it is said (p 475) :

"It is for the board of education, within the reasonable exercise of its power and discretion, to say

471

what is best for the successful management and conduct of the schools, and not for the courts."

The CTU also cites a number of authorities to show that collective bargaining does not involve a delegation of power. NLRB v. American National Ins. Co., 343 US 395 (1952) ; Norwalk Teachers Ass'n v. Board of Education, 138 Conn 269, 83 A2d 482 (1951) ; Local 266 v. Salt River Project, 78 Ariz 30, 275 P2d 393 (1954) ; and Fellows v. LaTronica, 151 Colo 300, 377 P2d 547 (1962), where it is said in a concurring opinion (p 551) :

> "The fact that the municipality engages in collective bargaining does not necessarily mean that it has surrendered its decision making authority with respect to public employment. The final decision as to what terms and conditions of employment the municipality will agree to, or whether it will agree at all, still rests solely with its legislative body."

■■■■ On the "central question," the right of collective bargaining in public employment in the absence of legislative authority, the briefs show exhaustive research, which has been of great assistance to this court, and the contentions of all parties are well stated. We conclude that the Board of Education of the City of Chicago does not require legislative authority to enter into a collective bargaining agreement with a sole collective bargaining agency selected by its teachers, and we hold that such an agreement is not against public policy. Therefore, the order of the trial court, which struck and dismissed the Broman complaint, was proper and within the court's power.

Conceding that this decision of the trial court dismissing Broman's complaint had the necessary effect of approving collective bargaining for public employees in Illinois, Broman states: "To this approval the court

appended certain additional statements, apparently expressing its opinion of the manner in which collective bargaining rights ought to be exercised in the public sector," and asserts that "these statements are of doubtful legal enforceability since the court dismissed the complaints and retained no jurisdiction over the cause. It is well settled that 'if an actual controversy is disclosed and is adjudicated by the court . . . the suit should not be dismissed; the proper practice is for the court to enter an order declaring the rights of the parties,' Burgard v. Mascoutah Lumber Co., 6 Ill App2d 210, 219 (1955)."

■ On this point, we note that plaintiff's complaint sought a declaratory judgment of the issues and injunctive relief. The court considered the pleadings, affidavits and exhibits and obviously decided that no material dispute existed as to the facts and that, therefore, there was no triable issue of fact. The court was within its equity powers in its attempt to give summary and complete relief in this case and dispose of the principal issues on such equitable terms as the court deemed required by public interest and the justice of the cause. (County of DuPage v. Henderson, 402 Ill 179, 191, 83 NE2d 720 (1949); Remus v. Schwass, 406 Ill 63, 73, 92 NE2d 127 (1950).) The court's direction that any agreement entered into "shall contain specific provisions whereby the employee organization shall agree not to strike, not to picket in any manner which would tend to disrupt the operation of any public school in the City of Chicago," was a reiteration of the pronouncements made by our Supreme Court in Board of Education of Community Unit School Dist. No. 2 v. Redding, 32 Ill2d 567, 207 NE2d 427 (1965).

■ We consider that it was within the court's discretion to retain jurisdiction or dismiss the action, and as said in Burgard v. Mascoutah Lumber Co., 6 Ill App2d 210, 127 NE2d 464 (p 219):

473

"There is no technical form prescribed for the declaration of rights; it is sufficient if the rights may be ascertained therefrom in connection with the findings of court or jury in view of the controversy presented."

Finally, we consider the principal contention of the plaintiff that Count II of its complaint stated a substantial cause of action, which required a hearing, and that the trial court's dismissal of the complaint was in error. In Count II, plaintiff alleged a number of acts of the defendant Board, which plaintiff contends manifested favoritism and partiality toward the CTU, and sought to enjoin the holding of a referendum election among the employees of the defendant Board until the prejudicial effects of the Board's preferential treatment in favor of the CTU had been eliminated.

Plaintiff argues that the prejudicial effect of Resolution 73408 was not removed because the court declared one paragraph void, and that "the prejudicial effect of the Resolution derives from the fact that prior to any election it evidences to the Board's employees the Board's prior agreement to deal only with Chicago Teachers Union in regard to 'any and all matters which are proper subjects of collective bargaining.' The potential voters are thus apprised of the Board's choice of a collective bargaining agent and the election may presumably be held merely to ratify the Board's choice. Invalidating the Resolution does not indicate that the Board's preference for the Union has disappeared; it merely indicates that the court did not share the Board's preference."

In response to this contention, the Board argues that as to one "discrimination" of which plaintiff specifically complained, in Resolution 73409, the plaintiff, at the court's direction, presented its objections to the Board, which amended the Resolution and eliminated the language of which plaintiff complained. Also, it is argued

that the second and last "discrimination" of which plaintiff complained was a provision in Board Resolution 73408, which the court, in the exercise of its equitable powers, held without force and effect.

The pleadings in this court show that the election was held on May 27, 1966, and the Board argues that it amended Resolution 73409 "exactly 205 days before the election was held. The Court held ineffective the cited language in Board Resolution 73408 exactly 94 days before the election. . . . The 'effects' of the original language were eliminated by its public negation; the Court by no means 'ignored' any portion of the complaint; and both counts were properly stricken after plaintiff's rights had been declared."

The Board further observes that "plaintiff has pointed to no provision of its Memorandum of Understanding which was 'violated' by the election. Plaintiff cannot assume that the Board will violate the decree by refusing to honor the terms of the Memorandum of Understanding until it terminates November 12 [1966]," and "that holding an election and entering into a collective bargaining agreement with the agency selected are two distinct and separate actions."

The CTU agrees with plaintiff that Resolutions 73408 and 73409 contained "inappropriate language," and asserts that "the union's sole desire was not favoritism but a democratic election," and "the sole question is whether the residual effects of the favoritism prejudiced Chicago Division in the election of May 27, 1966.

The CTU further argues: (1) The residual effects were so minimal as not to require a hearing and the Chicago Division well knows that the effects were insignificant; (2) The question does not warrant consideration because Chicago Division, by refusing to engage in the election of May 27, 1966, failed to mitigate its damage and waived its right to complain about the election.

475

As to this contention, it is apparent that plaintiff had cause to allege discriminatory conduct on the part of the Board, and the trial court was aware of it. While the matter was pending before it, and in its decree, the court took affirmative action to counteract and dissipate this alleged partiality and determined that Count II did not require a hearing because there was no material dispute as to the facts.

Just how much time was required to dissipate the effect of the alleged prejudicial conduct was primarily a question for the trial court, and we assume that the court considered this point in determining the provisions of its "Opinion and Decree." Accordingly, we find no reason to now disturb the court's dismissal of Count II of plaintiff's amended complaint.

In considering the "Opinion and Decree" and this record, we believe the trial court was presented with questions of substantial public interest, in a highly sensitive area, for which there were no precise limits or guidelines in this state. The court was required to act summarily if its action was to be effective. For the reasons given, the "Opinion and Decree" is affirmed.

Affirmed.

KLUCZYNSKI, P. J. and BURMAN, J., concur.