KEITH ASHCRAFT *et al.*, Plaintiffs-Appellants, *v.* BOARD OF EDUCATION OF DANVILLE COMMUNITY CONSOLIDATED SCHOOL DISTRICT NO. 118 OF VERMILION COUNTY, Defendant-Appellee.—(STATE BOARD OF EDUCATION *et al.*, Defendants.)

Fourth District   No. 15552

Opinion filed May 5, 1980.

CRAVEN, J., dissenting.

Drach, Terrell and Deffenbaugh, P. C., of Springfield, for appellants.

Wright & Wright, of Danville, for appellee.

Mr. PRESIDING JUSTICE MILLS delivered the opinion of the court:

Teachers' strike case.

To all teachers who would sign an affidavit that they would have taught if it had not been for the strike, the school board paid salaries for the four days of the strike.

Proper?

Yes—we affirm.

On August 21, 1977, the Danville Education Association and the Illinois Education Association voted to strike the Danville school system beginning on August 22, 1977. Upon being notified of the strike vote, the superintendent of schools made a public announcement closing the schools. The schools remained closed on August 22, 23, 24, and 25. Although some teachers attempted to come to school during this time, they were not permitted to do so, and no teachers performed any work on these days. On August 26, pursuant to a court order, the teachers resumed their duties and taught the balance of the school year.

Upon their return to work, the teachers resumed negotiations with the board. In a meeting held September 22, 1977, a committee from the school district met with a negotiating committee from the teachers' association. At that meeting, the district informed the teachers that it was the desire of the district to compensate those teachers who would have worked during the strike period but who were unable to do so because of the closure of the schools. The district did not wish to pay those teachers who had participated in the strike. To implement this salary classification, the district offered to pay those teachers who would sign an affidavit stating that they would have taught if the schools had not been closed and

if there had been no strike. *The teachers' representatives accepted this proposal and the agreement was signed by both negotiating teams.*

The proposal was ultimately manifested in the following form:

"E. An affidavit to be signed and notarized by certified employees verifying that they would have worked August 22, 23, 24, and 25, 1977, if there had been no strike, the certificate to verify that the said individual did not participate in the strike. All affidavits—except for emergencies—shall be returned to the director of personnel by 5 p.m. Friday, September 30, 1977. The affidavit will cover the strike action only of August 22, 23, 24, 25 of 1977."

The plaintiffs in this action are teachers who did not receive payment from the board. They filed their complaint which alleged a violation by the board of rights which are guaranteed by the first and fourteenth amendments to the United States Constitution and article I, sections 1, 2, 4, and 24 of the Illinois Constitution of 1970. Following a hearing, the circuit court entered judgment on behalf of the board and the plaintiff teachers appeal. (No issue has been raised in this court concerning whether the board has fulfilled its obligations under the contract.)

On appeal, the plaintiff teachers argue that the board's failure to pay them for the four days of the strike violated the due process and equal protection clauses of the Illinois and the United States constitutions. Each argument will be examined separately.

## Due Process

The term "due process of law" is not susceptible of exact or comprehensive definition. (16A C.J.S. *Constitutional Law* §567 (1956).) There have evolved, however, certain general guidelines to which we can look for guidance. The due process clause imposes its procedural safeguards to protect certain vital interests—life, liberty, and property. (*Lipp v. Board of Education* (7th Cir. 1972), 470 F.2d 802.) Substantive due process has been erected by the Supreme Court as the essential bulwark against arbitrary governmental action. (Schwartz, Constitutional Law, 165 (MacMillan 1972).) Arbitrary action, in the due process sense, means action that is wilful and unreasonable—depending on the will alone and not done according to reason or judgment. (Schwartz.) Arbitrary action is synonymous with unreasonableness and thus due process becomes a test of reasonableness. Schwartz, at 166.

■■ Having defined the standards by which we are guided, we narrow our inquiry to whether the plaintiffs have shown an arbitrary or unreasonable governmental action which has deprived them of a guaranteed property interest. We hold that no such showing has been made. We need not address the questions of whether the board's actions in this case constituted a State action, or whether plaintiffs had a vested

property right in being paid for the days they did not teach, because we find that the board's actions in this case were neither arbitrary nor unreasonable.

It is manifestly reasonable that the board would not want to penalize those teachers who did not participate in the strike but were precluded from fulfilling their duties and receiving compensation due to the strike. Had the schools remained open and these same teachers crossed the picket lines and taught, there would be no question that it would have been reasonable to pay these teachers and not pay those who honored the strike and did not teach.

Wholly apart from this, there is the question of the agreement. While we do not hold that the teachers are precluded from raising the question of reasonableness due to the agreement, we find it particularly persuasive that the affidavit of procedure was agreed to by the teachers' associations.

We are not persuaded by the cases which the plaintiffs have drawn to our attention. In *Littrell v. Board of Education* (1977), 45 Ill. App. 3d 690, 360 N.E.2d 102, the plaintiffs were tenured teachers who brought a declaratory judgment action against the school board. The evidence established that the plaintiffs had refused to sign contracts which were presented to them on the first day of the school term. Relying solely upon section 24—11 of the School Code (Ill. Rev. Stat. 1977, ch. 122, par. 24—11), the court found that the board's actions in paying plaintiffs less than other tenured teachers of like experience and education for performing like duties simply because they did not execute the written contracts was arbitrary and based upon an unreasonable classification.

We find the *Littrell* case distinguishable from the case at bench. First, the present case is not governed by section 24—11 nor its intended legislative purpose of protecting tenured teachers. Second, all the teachers here—striking and nonstriking—worked 176 days and all of them were fully paid for this work. Beyond this, the defendant agreed to pay any teacher for the four days which the schools were closed if that teacher would sign the specified affidavit. The school board was not legally obligated to pay the teachers for the four unworked days just as the teachers were not legally obligated to disavow their strike activity *via* the affidavit. Thus, unlike the parties in *Littrell*, both sides performed acts which constituted legal consideration.

We also find inapplicable the case of *Olshock v. Village of Skokie* (7th Cir. 1975), 541 F.2d 1254, which the plaintiffs claim is "strikingly similar" to the case at bar. There, police officers for the village engaged in a "uniform protest" which consisted of coming to work out of uniform. This protest was in direct violation of police department rules and regulations and 59 protesters were put on no-pay status after failing to don their uniforms when ordered to do so. Of the 59 protesters, 2

resigned, 2 were never charged with any regulations violation, 1 was found not guilty, 20 were suspended for various amounts of time, and 34 were discharged. Thirty-two of the 34 discharged officers brought suit alleging a deprivation of constitutional rights. After finding that the only distinction between those officers who were discharged and those who were merely suspended was the fact that the latter group was represented by legal counsel at the hearings, the court found that the distinction violated both due process and equal protection.

Unlike *Olshock*, the division in the instant case was not made between parties in similar circumstances. The instant distinction was based upon those who would have worked the four days in question and those who would not. Plaintiffs' due process rights have not been violated.

## EQUAL PROTECTION

The fourteenth amendment to the United States Constitution and article I, section 2, of the Illinois Constitution of 1970, both declare that no person shall be denied the "equal protection of the laws." This equality of right is fundamental and the equal protection clause forbids unequal governmental action that arbitrarily discriminates against some and favors others in like circumstances. (Schwartz, at 285-86.) The clause guarantees that similar individuals will be dealt with in a similar manner by the government. J. Nowak, R. Rotunda, & J. Young, Constitutional Law, 519 (West 1978).

The initial step in an equal-protection analysis is to determine the proper standard of review. The United States Supreme Court has enunciated at least two standards: The rational basis test wherein classifications are constitutional if they bear a rational relationship to a permissible State interest (*Dandridge v. Williams* (1970), 397 U.S. 471, 25 L. Ed. 2d 491, 90 S. Ct. 1153), and the strict scrutiny standard wherein classifications are constitutional only if they are necessary to promote a compelling State interest (*Dunn v. Blumstein* (1972), 405 U.S. 330, 31 L. Ed. 2d 274, 92 S. Ct. 995). The latter test is applied when reviewing State-created classifications which interfere with the exercise of a fundamental right or a suspect classification. *San Antonio Independent School District v. Rodriguez* (1973), 411 U.S. 1, 36 L. Ed. 2d 16, 93 S. Ct. 1278; see also *Gault v. Garrison* (7th Cir. 1977), 569 F.2d 993.

■ The classification in this case is to be measured by the rational basis test. The instant classification was not a suspect one calling for stricter scrutiny since it was based on economic and policy considerations and was totally unrelated to the types of personal traits and stereotyped grouped characteristics which have formed the basis for classification which has been found to be suspect. *Harper v. Wood* (5th Cir. 1977), 560

F.2d 202; see also *Massachusetts Board of Retirement v. Murgia* (1976), 427 U.S. 307, 49 L. Ed. 2d 520, 96 S. Ct. 2562.

The clear purpose of the instant classification was to compensate all teachers for the time they either worked, or would have worked. The distinction drawn in this case was reasonably related to this legitimate purpose.

The distinction in the instant case is consistent with the public policy advanced in *Board of Trustees v. Cook County College Teachers Union* (1979), 74 Ill. 2d 412, 386 N.E.2d 47, that striking teachers should not be allowed to profit from their illegal strike activity. There, the supreme court found an arbitration agreement to violate this policy when it benefited striking teachers to the detriment of those not participating in the strike. By the same token, a salary classification based on whether or not a teacher has engaged in such a strike is consistent with this public policy principle.

■ We therefore hold that the salary classification is not violative of the State and Federal constitutions.

As a final note, the dissenting opinion of Mr. Justice Craven, with its intricate mathematical analysis, runs far afield of the issues which were presented to this court. The dissent deals with straw men. We were not asked to pass upon the wisdom of the agreement between the teachers and the board. Nor were we asked to decide whether it is "illegal" for public employees to strike. And—finally—we were not asked to determine whether the school district has faithfully performed its portion of the agreement. Not having been asked these questions, we are without authority to provide the answers.

The dissent simply distends beyond the pale of our judicial functions.

Affirmed.

TRAPP, J., concurs.

Mr. JUSTICE CRAVEN, dissenting:
The provision in question provided:

> "E. An affidavit to be signed and notarized by certified employees verifying that they would have worked August 22, 23, 24, and 25, 1977, if there had been no strike, the certificate to verify that the said individual did not participate in the strike. * * *."

This posed two propositions to each teacher: that he would have worked but for the strike, and that he did not participate in the strike. These two assertions are logically independent, for neither entails the other. A teacher could consistently assert the truth of either one while

denying the other. Thus, these two propositions present two-times-two or four possible combinations of activity or belief and four potential classifications of teachers: First, those who would not have worked even if the strike had not been occurring and did not participate in the strike; second, those who would not have worked but did participate; third, those who would have worked and did not participate; and, fourth, those who would have worked but did participate. The board sought to reward the third group of teachers, those who would have worked and did not participate in the strike. But because even those teachers most committed to the strike could agree that they would have worked had the strike not been occurring, the second proposition, based on participation, represents the intended division and true basis for classifying teachers. The majority finds an exchange of consideration in signing the affidavits and receiving the bonuses, yet the behavior rewarded was not participating in the strike. On August 22, 23, 24, and 25, thus, the teachers were invited to gamble, in a wager that Pascal might have recommended taking, participation in the strike against the belief in the possibility of future rewards. The board thus intended to pay bonuses to those teachers who would "verify" that they did not participate in the strike. Presumably, "participation" means more than just staying home from work because the board closed the schools and thus no one could work. Yet "participation" goes undefined. Perhaps "participation" means voting for the strike, or picketing, or stenciling signs for those picketing, or brewing coffee for those picketing, or transporting to the picket lines a person intending to picket; "participation" cries out for definition.

Whatever the board meant in using "participation," I find the classification objectionable. Although the supreme court has ruled that employees in the public sector—unlike those in the private sector—do not have the right to strike (*City of Pana v. Crowe* (1974), 57 Ill. 2d 547, 316 N.E.2d 513), the "illegality" of the strike does not justify the school board's payment of bonuses to those who said that they had not "participated" in the strike. I do not agree with the majority's reliance on *Cook County College*. In that case, striking teachers clearly would have received favorable treatment under their arbitration agreement. In contrast, the negotiated settlement here seeks to reward teachers who disavowed their strike activity to the exclusion of those who stood firm in their commitment to the teachers' association. While some may object to rewards for teachers for their strike activity, it does not necessarily follow that it is right to reward other teachers who will say that they did not participate in the strike. The end result of this affidavit procedure was a disparity in salaries based solely on the signing of an affidavit. This is precisely the same situation as in *Littrell*, where the court rejected a salary distinction based solely on the signing of a contract.

With the second proposition, participation, serving as the real distinction between those to be given bonuses and those not to be given bonuses, the board's obvious intention was to reward the teachers who said that they were not being cooperative with the teachers' association and punish the teachers who with commendable candor admitted such cooperation. A pay classification intended to provoke dissension among the teachers violates, rather than serves, public policy. Collective bargaining between public employees and their public employer is not against Illinois law or public policy (*Chicago Division Illinois Education Association v. Board of Education* (1966), 76 Ill. App. 2d 456, 222 N.E.2d 243), yet the board's action here was designed to cripple the teachers' association in its role as bargaining agent.

Furthermore, the procedure used in obtaining the affidavit and rewarding the affiants was followed in such a helter-skelter fashion that some teachers who signed the affidavit were not paid the bonus and some who did not sign were paid. The board's clumsy execution of their scheme undermines the intended rationality of the classification based on those supporting and those opposing the strike; the record clearly shows that the board acted arbitrarily.

A final disturbing aspect of this case is that public funds are used for the patent purpose of weakening the teachers' association; an earlier period in labor history would have called the documents submitted to these teachers "yellow dog" affidavits. As I've noted, there is nothing illegal about public employee collective bargaining.

This litigation is but part of the vast number of cases that arise because of the absence of any meaningful legislation to deal effectively with strikes in the public sector. In our earlier opinion in this case, *Board of Education v. Danville Education Association* (1978), 59 Ill. App. 3d 726, 376 N.E.2d 430, we held that courts should not enjoin informational picketing unless the party seeking the injunction can prove that picketing will likely cause disruption. Courts by writ of injunction cannot compel teachers to teach, firemen to fight fires, nor cure other forms of "blue flu." After the issues are finally resolved, as they ultimately must be, the parties usually want the judicial orders vacated and the courts to withdraw from any involvement.

*Illinois Education Association v. Board of Education* (1975), 62 Ill. 2d 127, 340 N.E.2d 7, and *Board of Trustees v. Cook County College Teachers Union* (1976), 62 Ill. 2d 470, 343 N.E.2d 473, have severely limited the scope of collective bargaining for teachers and their public employers; those cases held that bargaining pertaining to a board's statutory, nondelegable discretionary power is illegal and unenforceable. The decisions thus limit an arbitrator's power to remedy grievances that clearly fall within the scope of the collective bargaining agreement (see

Stevens, *Arbitrability in the Illinois Courts*, 31 Arb. J. 1 (1976)), and determining "the permissible scope of collective bargaining agreements" becomes the overriding issue where boards are not required to bargain collectively and may even withdraw from bargaining after it has begun. Eisenhammer & Trizna, *The Permissible Scope of Public Sector Bargaining in Illinois: A Proposed Solution*, 12 J. Mar. J. Prac. & Proc. 509 (1979); see also Weisberger, *The Appropriate Scope of Bargaining in the Public Sector: The Continuing Controversy & the Wisconsin Experience*, 1977 Wis. L.R. 685.

In the Steelworkers Trilogy, the United States Supreme Court defined the narrow role that courts should play in deciding disputes that arise under collective bargaining agreements in the private sector. Arbitration is the preferred method of resolving those questions. By entering into a collective bargaining agreement the parties have erected a voluntary system of self-government; the arbitrator neutrally agreed upon by the parties is to apply the contract terms to the dispute. Thus, courts should not decide the merits of the grievance (*United Steelworkers of America v. American Manufacturing Co.* (1960), 363 U.S. 564, 4 L. Ed. 2d 1403, 80 S. Ct. 1343); courts should limit their inquiry to whether the recalcitrant party agreed to arbitrate the particular question (*United Steelworkers of America v. Warrior & Gulf Navigation Co.* (1960), 363 U.S. 574, 4 L. Ed. 2d 1409, 80 S. Ct. 1347); courts should not review the merits of the arbitrator's decision (*United Steelworkers of America v. Enterprise Wheel & Car Corp.* (1960), 363 U.S. 593, 4 L. Ed. 2d 1424, 80 S. Ct. 1358).

In *Board of Trustees v. Cook County College Teachers Union* (1979), 74 Ill. 2d 412, 386 N.E.2d 47, the Illinois Supreme Court applied the principles enunciated in the Steelworkers Trilogy to grievance arbitration in the public sector. But because the steelworkers' cases pertain to disputes under pre-existing contracts and and collective bargaining agreements, grafting the Triology onto this State's public labor law cannot solve the threshold problems concerning the public employer's duty to bargain, the types of bargainable issues, and the dilemma faced by employees at the bargaining table when any strike is illegal. These problems are much more settled in the private sector, and public employees in Illinois still await their labor bill of rights.

Various solutions have been proposed to settle matters in this field. Because the National Labor Relations Act specifically exempts public employees from its coverage (29 U.S.C. §152 (1973)), Federal legislation modeled after the N.L.R.A. has been proposed to fill this void; despite *National League of Cities v. Usery* (1976), 426 U.S. 833, 49 L. Ed. 2d 245, 96 S. Ct. 2465, which held unconstitutional the extension of minimum

wage and maximum hour provisions in the Fair Labor Standards Act to State and local employees, Federal legislation on this subject would probably be constitutional under the commerce clause, the spending power, or the enforcement provision of the fourteenth amendment. See Shaller, *The Constitutionality of a Federal Collective Bargaining Statute for State and Local Employees*, 29 Lab. L.J. 594 (1978).

By 1975, 24 States had laws dealing with collective bargaining by public employees (Dunham, *Interest Arbitration in Non-Federal Public Employment*, 31 Arb. J. 45 (1976)). Since 1945, when the first public employee labor relations bill was introduced in the State legislature, Illinois has repeatedly failed to enact legislation on this subject. (See Comment, 8 Loy. U.L.J. 209 (1976).) "Interest arbitration" refers to arbitrating disputes that arise as the parties are negotiating a collective bargaining agreement; "grievance arbitration," also called "rights arbitration," refers to arbitrating disputes that arise under a collective bargaining agreement. When the private employer and union cannot negotiate a collective bargaining agreement and contract, the parties apply economic pressures such as strikes and lockouts. But because most States consider strikes by public employees illegal, some form of interest arbitration becomes necessary to protect the employees' bargaining position. Determining how "finality to a bargaining dispute can be brought about when the parties reach a true impasse" in their negotiations is the most difficult question faced in drafting legislation for public collective bargaining. (Dunham, 31 Arb. J. 45, 47.) Various methods of resolving an impasse include advisory fact-finding, fact-finding with voluntary binding arbitration, compulsory binding arbitration, and final-offer arbitration; some States permit strikes. (Dunham.) Some States use several methods as stages in the process of resolving impasses. (See Holden, *Final-Offer Arbitration in Massachusetts*, 31 Arb. J. 26 (1976).) Yet, compulsory interest arbitration, in whatever form, is not without its problems. Arbitrators of rights as opposed to interests by definition apply existing contract terms to the dispute; the arbitrator of rights operates within a voluntary system of industrial self-government, limiting himself to contract terms and not legislating, as it were, for the parties. Interest arbitration imposes a new and more difficult role on the arbitrator, requiring him to make policy choices that concern substantive questions such as salaries and work assignments. For these reasons many arbitrators oppose or are wary of interest arbitration. (See Bornstein, *Interest Arbitration in Public Employment: An Arbitrator Views the Process*, 29 Lab. L.J. 77 (1978).) In the absence of interest arbitration, public employee collective bargaining is vitiated unless the employees may strike when contract negotiations break down; without the right to exert

economic pressure when no other means exist for resolving bargaining impasses, the employees are left to choose between their employer's "best" offer and the inevitable injunction that accompanies an illegal strike.

Thus, I write in this case to note as best I can the urgent need for legislative action in the area of public employee strikes. The authority to issue and the issuance of injunctions solve no problem as this case indicates, unless, of course, the courts are empowered to and do impose contract provisions as a condition precedent to any injunctive relief. See *Board of Education v. Springfield Education Association* (1977), 47 Ill. App. 3d 193, 361 N.E.2d 697.