Charles W. OLSHOCK et al., Plaintiffs,

v.

VILLAGE OF SKOKIE, an Illinois Municipal Corporation, et al., Defendants.

No. 75 C 3056.

United States District Court, N. D. Illinois, E. D.

Feb. 4, 1976.

Robert A. Tingler and Freeman & Tingler, Chicago, Ill., for 29 of 32 plaintiffs.

Gerald Bender, Chicago, Ill., for plaintiffs Robert Jones and Terry Proudfit.

Robert Krajcir, Chicago, Ill., for plaintiff James M. Chwalisz.

Harvey Schwartz and Gilbert Gordon, Skokie, Ill., representing the Village of Skokie and Kenneth B. Chamberlain, Chief of Police.

Robert DiLeonardi and DiLeonardi & O'Brien, Des Plaines, Ill., for defendant Board of Fire and Police Commissioners of the Village of Skokie and defendants Ben Pastko, William Elliott and Max Rabin.

## FINDINGS OF FACT and CONCLUSIONS OF LAW

PERRY, District Judge.

This action having been tried by the court without a jury, and the court having heard oral argument of counsel for the parties and having considered all of the evidence, the memoranda and exhibits filed herein, and now being fully advised in the premises, hereby makes the following Findings of Fact and Conclusions of Law:

### Findings of Fact

1. The thirty-two plaintiffs herein and twenty-seven other policemen of the Village of Skokie,—making a total of 59 patrolmen,—engaged, up to July 3, 1975, in negotiations with officials of said village over salary increases without reaching agreement.

2. On July 3, 1975 the aforesaid 59 policemen commenced what they termed a protest over the efforts of the Village of Skokie to remove annual monetary increments during the first four years of a patrolman's employment.

3. The aforesaid protest was a concerted action whereby on various days between July 3 and July 13, 1975 the policemen reported for duty out of uniform and, when ordered to put on their uniforms, refused to do so.

4. All but two of the policemen who engaged in this protest were charged with two violations of regulations: failure to report at roll call properly uniformed, and failure to obey an order to change into uniform.

5. At all times pertinent hereto, there were in full force and effect, regulations that required said policemen to wear uniforms while on duty. All of the plaintiffs herein were aware of said regulations.

6. During the period July 3, 1975 until July 14, 1975, wives and children of some of the aforesaid policemen forcibly seized and for several days held possession of the Village Hall of the Village of Skokie. During the period of their possession, said wives and children permitted plaintiff Charles W. Olshock, president of Combined Counties Police Association (hereinafter called "Union"),—a policemen's union to which the plaintiffs herein belonged,—to enter the Village Hall, but they restrained all officers and employees of the Village of Skokie and all other persons from entering said Village Hall; they even evicted one village official after he managed to gain entrance. After the Union meeting, the women occupying the Village Hall decided to withdraw their occupancy. When this decision was made, several Union members, including plaintiff Anglin, were present. The women ceased their occupancy of the Village Hall at an unascertained time subsequent to the Union meeting.

7. By their aforedescribed actions, the plaintiffs herein together with the aforesaid wives and children brought about a state of governmental chaos, a complete disruption of the orderly management of municipal matters, and a near breakdown in law enforcement,—all resulting in a most serious threat to the safety and welfare of some 68,000 citizens and residents of the Village of Skokie. The aforedescribed acts were aided, abetted, and organized by the plaintiffs herein.

8. On the morning of July 13, 1975, there was a meeting of the members of the Union at the Holiday Inn in Skokie. Most of the plaintiffs herein attended the meeting. Two votes were taken on the question of whether the members should return to work in uniform. The majority voted twice not to do so. After some discussion, the policemen who voted in favor of returning to work in uniform made it plain that they would do so irrespective of the majority vote. As a consequence, and as the result of the advice of their Union attorney, Mr. John Burpo, it was decided that all of the striking policemen would return to work in uniform. The meeting adjourned at about 1:00 P.M. on July 13, 1975.

9. Subsequent to the aforesaid meeting, none of the plaintiffs returned to work in uniform prior to 6:00 A.M. on July 14, 1975. Plaintiffs Proudfit, Jones and Carter testified that they had attempted to return to work on July 13th and that for this purpose they contacted Captain Varallo of the Skokie Police Department; but that Captain Varallo told them to report for work on the following day, July 14th, which they did. Captain Varallo, however, did not recall any of the aforementioned colloquies. Plaintiffs Proudfit and Jones testified that they would have asserted their attempt to return on July 13th in mitigation if they had been given separate mitigation hearings.

10. Hearings on the charges described in paragraph 4 above commenced on July 14, 1975 before the defendant Skokie Board of Fire and Police Commissioners (hereinafter called "the Board") and continued into September, 1975. As the result of said hearings, 34 policemen including the 32 plaintiffs herein were discharged; 20 policemen were suspended for specific periods of time ranging from 2 days to 30 days; and one policeman was found not guilty as charged. Of the 59 policemen who initiated the protest, 2

were not charged and 2 resigned from the police department prior to the completion of their hearings.

11. Except for the plaintiffs herein, all of the policemen who on or after July 3, 1975 and until July 14, 1975, had withdrawn their services as police officers in uniform, appeared for trial at administrative disciplinary hearings conducted by the defendant Board and, although pleading "technically not guilty", signed stipulations of fact wherein they admitted that they had refused to perform their duty in uniform and that they had disobeyed orders to put on their uniforms and perform their duties therein. These policemen were found guilty and were suspended from duty without pay for specific periods of time. Before they were suspended, said policemen had stated that they would not be represented by counsel for the Union (Mr. Burpo), or by other counsel; and in fact they were not represented at their hearings by any counsel; they appeared *pro se* and in the record waived their right to any counsel after they were asked if they desired to have counsel.

12. Plaintiffs herein all refused to enter into the arrangement described in paragraph 11 above. Rather, they chose to be represented by counsel, to plead not guilty, and to go to trial. All plaintiffs herein were tried, were found guilty, and were discharged.

13. The evidence upon which the plaintiffs herein were found guilty and then discharged was identical to the evidence to which all the other policemen stipulated and upon which all the other policemen were found guilty and then merely suspended without pay for specific periods of time. The plaintiffs herein did not contest the same facts that were stipulated to by the other officers and they offered no evidence whatsoever to contradict said facts.

14. In the case before this court, the Board found the plaintiffs and 27 other striking policemen guilty of repeated insubordination and of repeated violations of department rules.

15. In each instance resulting in the discharge of the plaintiffs herein, the Board held hearings upon written charges filed by Chamberlain, Chief of Police of the Village of Skokie, as to each of said plaintiffs. The Board issued separate written findings and decisions which, in addition to the specific findings of guilt as to particular acts, determined that cause existed for the discharge of each of said plaintiffs.

16. The statute under which the Board conducted its hearings and discharged said plaintiffs is Illinois Revised Statutes, Chapter 24, Section 10–2.1–17, which provides in pertinent part:

10–2.1–17. Removal or discharge—Investigation of charges—Retirement

Except as hereinafter provided, no officer or member of the fire or police department of any municipality subject to this Division 2.1 shall be removed or discharged except for cause, upon written charges, and after an opportunity to be heard in his own defense. The board of fire and police commissioners shall conduct a fair and impartial hearing of the charges, to be commenced within 30 days of the filing thereof, which hearing may be continued from time to time. In case an officer or member is found guilty, the board may discharge him, or may suspend him not exceeding 30 days without pay. The board may suspend any officer or member pending the hearing with or without pay, but not to exceed 30 days. If the Board of Fire and Police Commissioners determines that the charges are not sustained, the officer or member shall be reimbursed for all wages withheld, if any. In the conduct of this hearing, each member of the board shall have power to administer oaths and affirmations, and the board shall have power to secure by its subpoena both the attendance and testimony of witnesses and the production of books and papers relevant to the hearing.

17. The Illinois statute under which this Board discharged said plaintiffs pro-

vides in terms that the Board may suspend any police officer, up to 30 days, pending its hearing. It also provides that if the Board as a result of its hearings determines that charges against a policeman are not sustained, said policeman shall be reimbursed for all wages withheld.

Thus the statute does not require a pre-suspension hearing after written charges are filed and while a hearing on the charges is pending. The statute thus permits the Board to suspend a charged policeman for up to 30 days pending his hearing. The statute does not state that a charged policeman cannot be suspended more than once while the charges against him remain pending and undetermined.

The statute in terms provides that hearings may be continued from time to time. The statute provides that a hearing on the charges must be commenced within 30 days after the filing of said charges, but it does not specify the time frame within which the hearing must be completed.

The statute does not require a separate mitigation hearing.

18. With the exception of Officers DeGusto, McLaughlin, and Quante, all of the protesting policemen who returned to work in uniform on July 14, 1975 were discharged. Officers DeGusto, McLaughlin, and Quante were suspended only, despite the fact that they had returned to work in uniform on July 14, 1975.

Officers DeGusto and McLaughlin were not represented by any attorneys at any time pertinent hereto.

Officer Quante was represented by a non-Union attorney, Mr. Jacobs, and then only for the purpose of presenting matters in mitigation of punishment. Officer Quante first presented himself to the Board on July 16, 1975. He stated that he did not desire to have an attorney at that time. Charges were read to him and he entered a plea of "technically not guilty". He entered into a stipulation as to what certain Village witnesses would say. No further evidence was presented by the Village and Officer Quante produced no evidence as to guilt or innocence. The Board found Officer Quante guilty. Up to this point, Officer Quante had said that he had no attorney. Officer Quante next came before the Board on July 19, 1975. He was advised by the Chairman of the Board that he had been previously found guilty and that he could have counsel if he desired. Officer Quante stated that he had no counsel and that he desired no continuance. After the Village presented matters in aggravation, the Board asked if either party had anything else to say. The Board attorney told Officer Quante that he should understand this was the last evidence the Board would be hearing in mitigation and aggravation. Officer Quante indicated that he understood. On July 31, 1975 Officer Quante obtained a continuance to August 4, 1975, again without any mention of having, or desiring to have counsel. On August 4, 1975 Officer Quante concluded his mitigation hearing by appearing with a non-Union attorney, Mr. Jacobs. The attorney called the two mitigation witnesses whom Officer Quante had previously requested, and asked them about Officer Quante's work record. Thereafter Officer Quante read a prepared statement into the record, at which point Attorney Jacobs rested Officer Quante's case. Defendant Board member Pastko then asked Officer Quante when he had sought legal advice. Officer Quante replied, "Within the last 10 days", which would have been subsequent to the time he had been found guilty and after he had heard the Village's case in aggravation.

19. Officers Hanline and Lowen, although not parties to this case, were represented by Union lawyers at the outset of their hearings, but then they discharged their Union lawyers and thereafter appeared without counsel. They then pleaded "technically not guilty" and stipulated to the facts as aforesaid,—just as had been done by the 20 policemen who had previously been found guilty

and suspended only. Nevertheless, Officers Hanline and Lowen were discharged.

20. Captain Halas was the second officer in command under defendant Chief of Police Chamberlain. Captain Halas testified that he informed all the protesting policemen who contacted him that he would try to save their jobs if they reported for duty in uniform prior to July 14, 1975. He made this statement to said policemen with the knowledge of said Chief Chamberlain.

21. During the progress of the Board's hearings, plaintiffs herein were re-suspended for up to 30 days.

22. With the exception of Officer Quante, all of the policemen who were charged and who continued to be represented by counsel throughout their hearings, were discharged. Officer Quante obtained his counsel, however, for the sole purpose of representing him upon mitigation matters,—not for the purpose of disputing charges of his guilt.

23. The plaintiffs' reporting for duty out of uniform, and their refusal to don their uniforms when ordered to do so, were acts done upon advice of Mr. John Burpo, counsel for the Union of which plaintiffs herein were members.

24. All of the plaintiffs herein were advised, prior to July 3, 1975, and well knew thereafter that a strike by policemen is illegal in Illinois. Their counsel, Mr. John Burpo, however, advised them that their actions of reporting for duty out of uniform and their refusal to put on their uniforms when ordered to do so, did not constitute a strike, even though as a lawyer he should have known better than to give such advice.

25. Two of the three defendant members of the Board testified that the time and date when the protesting policemen returned to work in uniform was one of the factors,—but not the controlling factor,—which the Board members considered before arriving at their decision to discharge plaintiffs herein.

26. Those striking policemen who continued to have the Union attorney represent them, who did not return to work in uniform until July 13, 1975, who pleaded not guilty at their Board hearings, and who did not stipulate to their having reported for duty out of uniform during the strike and to their refusal to put on their uniforms when ordered to do so, were found guilty and were discharged.

27. Those policemen who attended the Union meeting on July 13, 1975, who voted to return to work, and who made it clear that they would immediately return to work in uniform regardless of the outcome of the majority vote, were suspended only.

The policemen who were discharged, including plaintiffs herein, were primarily those who at the Union meeting had twice voted not to return to work in uniform. This was an important factor in the Board's determination of who would be suspended and who would be discharged.

28. Defendants herein caused certain striking policemen, but none of the plaintiffs herein, to be given informal notice that they would not be discharged if they reported for duty in uniform on or prior to July 13, 1975.

29. Two or three of the plaintiffs were informed of plaintiff Olshock's trial, which was admitted to be a bellwether trial because of plaintiff Olshock's position as the president of the Union.

Officer Olshock pleaded not guilty outright and contested his guilt, although he put in no evidence to dispute his participation in the protest by reporting for duty out of uniform and refusing, when ordered to do so, to put on his uniform. Officer Olshock was found guilty and was discharged upon the identical evidence on which those policemen who discharged their attorney, pleaded "technically not guilty" and stipulated to the facts as aforesaid, were found guilty and suspended only.

The aforesaid two or three plaintiffs, who had been represented by the Union attorney, sought to avoid the fate of Officer Olshock. Accordingly, they dis-

charged their Union attorney after the Olshock hearing; they pleaded "technically not guilty" and stipulated to the facts as aforesaid. But they were found guilty and discharged nonetheless. They were too late: they had returned to work on July 14, 1975. They had not been informally notified that July 13th was the "deadline".

30. The defendant members of the Board and defendant Chief of Police Chamberlain had conversations with various protesting policemen and thereby became aware of those policemen who intended to abandon the protest and return to work in uniform regardless of the recommendations of the Union officers or the Union attorney, Mr. John Burpo. Said policemen were given notice, in said conversations, that they would not be discharged but would be merely suspended, provided that: (1) they return to work in uniform on or before July 13, 1975, and (2) pleaded "technically not guilty", and stipulated to the facts that they had reported for duty out of uniform and had refused to obey orders to put on their uniforms during their protest.

31. Those policemen who were informally notified as aforesaid, who did return to work in uniform on or before July 13, 1975, who did discharge their attorneys and did thereafter plead "technically not guilty" and did stipulate to the aforesaid facts, were suspended only. With the exception of Officer Quante,— who was never represented by a Union attorney,—those policemen, including plaintiffs herein, who pleaded not guilty, who stood trial but did not offer evidence to contest the undisputed testimony that they participated in the protest by reporting for duty out of uniform and by refusing thereafter to obey orders to put on their uniforms, were found guilty and were discharged.

32. Except for Officers Proudfit, Jones and Carter, all of the plaintiffs herein and all other policemen who were discharged were represented by the Union attorney, Mr. John P. Burpo, until the Union meeting on July 13, 1975.

33. At his Board hearing, each plaintiff received adequate opportunity to present an argument, a statement, or other evidence in mitigation of disciplinary action prior to the time the Board meted out ultimate disciplinary action against him.

Plaintiffs Proudfit and Jones, even though not the recipients of what they term "separate mitigation hearings", were nonetheless given the aforesaid opportunity in the hearing process wherein said plaintiffs were permitted to, and did, present evidence explaining by way of mitigation, the circumstances and motivation of their actions.

34. Evidence which has been presented to and considered by this court consists of the transcript of proceedings, with exhibits thereto, of the hearings conducted by the Board; testimony from each defendant herein, some of the plaintiffs herein, and various other witnesses.

35. At the close of plaintiffs' case, defendants Chamberlain, Chief of Police of the Village of Skokie, and defendants Pastko, Elliott, and Rabin, members of the Board, were ordered dismissed from this cause in their individual capacities.

36. Due to the policemen's illegal strike, the Village of Skokie was forced to pay $159,297.00 in excess payroll expenses, and $65,832.45 in other expenses including $23,125.30 in attorneys' fees.

37. Some of the plaintiffs received unemployment compensation from the State of Illinois since July 4, 1975.

38. Some of the plaintiffs have had full-time employment for some period of time subsequent to July 4, 1975.

39. The Village of Skokie and its inhabitants have suffered immense and irreparable damage because of the near breakdown in law enforcement as shown by the evidence. This damage was caused by the action of the plaintiffs and other policemen who engaged in the illegal strike against the Village of Skokie. In addition, the Village of Skokie has suffered many thousands of dollars in monetary damages because of costs of overtime salaries for police officers. The

persons jointly responsible for these damages are all 59 policemen who engaged in the illegal strike.

40. In brief, the Village officials decided their problem could best be settled if they followed Ceasar's military strategy of "divide and conquer". To accomplish this, the Village officials had subordinate officials talk with patrolmen and through them learned that a number of patrolmen would abandon their protest contrary to the Union's orders. The Village officials learned that there were a number of patrolmen who would not abandon their protests without the Union's approval. The Village officials then decided to suspend those who were willing to abandon their protest on their own volition, and to discharge those who would not abandon their protests except upon the approval of the Union.

### Conclusions of Law

1. The court has jurisdiction over the subject matter of and the parties to this litigation.

2. The advice given to the plaintiffs by their counsel, Mr. John Burpo,—to wit, that reporting for duty out of uniform and refusing to put on uniforms when ordered to do so did not constitute a strike,—was patently incorrect.

■ The action of the plaintiffs in reporting for duty out of uniform and in refusing orders to perform their duty in uniform was not merely the exercise of their right to engage in lawful, protected concerted union activities. It was not a lawful protest made for the purpose of collective bargaining or other mutual aid or protection. It was, rather, a strike by policemen in violation of well-settled law. Policemen have no constitutionally-protected right to strike. *City of Waukegan, Fletcher v. Civil Service Commission of Waukegan*, 6 Ill.App.3d 593, 286 N.E.2d 130 (2nd Dist. 1972).

■ 3. The fact that plaintiffs herein participated in an unlawful strike upon the advice of their counsel can neither excuse the unlawful character of their actions nor absolve them from the consequences of their illegal behavior.

■ 4. Due process did not require a hearing prior to the Board's suspension of plaintiffs during the time that charges against them were pending before the Board. *See, e. g. Barszcz v. Board of Trustees of Community College District No. 504*, 400 F.Supp. 675 (N.D. Ill.1975); *R. A. Holman & Co. v. SEC*, 112 U.S.App.D.C. 43, 299 F.2d 127 (1962), *cert. denied*, 370 U.S. 911, 82 S.Ct. 1257, 8 L.Ed.2d 404 (1962); *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), *rehearing denied*, 417 U.S. 977, 94 S.Ct. 3187, 41 L.Ed.2d 1148 (1974); *Sanford v. Rockefeller*, 35 N.Y.2d 547, 364 N.Y.S.2d 450, 324 N.E.2d 113 (1974); *Morgan v. Fletcher*, 518 F.2d 236 (5th Cir. 1975); *Fahey v. Mallonee*, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947); *North American Cold Storage Co. v. Chicago*, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908).

■ This case was an emergency situation wherein plaintiffs, *inter alia*, had brought about a state of governmental chaos and a near breakdown in law enforcement, resulting in a most serious threat to the safety and welfare of some 68,000 people,—inhabitants of the Village of Skokie. Order had to be restored and the Board's pre-hearing suspension of the plaintiffs was fully justified in light of the aforedescribed emergency situation.

5. Defendant Board members concluded that they should discharge all of the policemen who continued to be represented by their Union attorney, Mr. John Burpo. Said members determined that, in order to preserve discipline within and to require loyalty to the Skokie Police Department, they could not and would not allow either Attorney Burpo or the Union to dictate whether or when the striking policemen should abandon their strike and return to work.

■ 6. The Board considered the date a striking policeman returned to work in uniform to be a crucial factor in determining whether he should be dis-

charged or merely suspended. Thus, none of the striking policemen who returned to work in uniform on or prior to July 13, 1975 was discharged; he was merely suspended for various periods of time. The plaintiffs, however, returned to work in uniform the following day, July 14, 1975, and were all discharged.

7. The failure of defendants to give all of the 59 striking policemen notice that they would not be discharged if they reported for duty in uniform on or prior to July 13, 1975, and the failure of defendants to give said notice to the plaintiffs herein, constituted a failure to provide equal protection of the laws to plaintiffs within the meaning of and as required by the Fourteenth Amendment to the United States Constitution, even though such failure was in good faith and was founded upon extreme provocations by the plaintiffs and the other striking policemen.

8. The discharge of the plaintiffs herein was due in large part to their having been deprived of due process of law by the several defendants, in that said plaintiffs did not receive notice that they would not be discharged if they returned to work in uniform prior to July 14, 1975, whereas other, more favored striking policemen had received such notice and had acted upon it to their advantage in that they were merely suspended on the very same evidence upon which the plaintiffs were found guilty and discharged.

9. The discharge of the plaintiffs herein was also due in part to their having been deprived of equal protection under the laws by the defendants herein in that the defendants unreasonably discriminated against the plaintiffs for adamantly exercising their right to be represented by counsel throughout the Board hearings, for pleading not guilty and contesting their guilt, and for not stipulating that on various days during the strike they had reported for duty out of uniform and had refused to obey orders to put on their uniforms after so reporting.

10. As to plaintiffs herein, the Board applied the statute governing discipline of policemen unequally and in an intentional and unreasonably discriminatory manner, which action by the Board has deprived said plaintiffs of their constitutional right to equal protection of the laws. *See Snowden v. Hughes*, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944).

11. All of the defendants, however, acted in good faith at all times and under most trying circumstances. None of said defendants acted with any malice whatever toward any of the plaintiffs or other policemen involved in the strike. The conduct of the defendants has been beyond reproach. Each of the defendants, their attorneys,—Mr. Harvey Schwartz, Mr. Gilbert Gordon, and Mr. Robert Di Leonardi,—and said attorneys' associates, went far beyond the call of duty at all times. Despite the most adverse circumstances, they exercised calm and good judgment and tolerated unwarranted abuse and threats cast upon them by persons in sympathy with the illegal strike. They resorted to the Cook County Circuit Court for injunctive relief when the wives and children of some of the plaintiffs and of some other striking policemen took possession of the Skokie Village Hall with the connivance of said policemen, while said policemen in effect "stood guard". When the wives refused to obey the order of the court to vacate the Village Hall, the defendants and their attorneys nonetheless went about the task of discharging their official duties at alternate locations at great inconvenience and personal sacrifice to themselves. They eschewed the eviction of the wives by force; rather, they relied upon public disapproval of the wives' occupancy of the Village Hall to accomplish their lawful repossession thereof, thus avoiding the possibility of riot and bloodshed.

In contrast, the conduct of the plaintiffs and other striking policemen was inexcusable, albeit most of them had good records as policemen and had been of service to the inhabitants of the Village of Skokie. The best that can be

said of the plaintiffs and other striking policemen is that they were shamefully misled by the officers of and attorneys for their Union,—particularly by Mr. John P. Burpo, who gave them advice which led them to believe that they were acting within their legal rights, when such was not the case.

■ 12. The damage done to the Village of Skokie should not be borne alone by the 32 plaintiffs herein. Accordingly, any and all damages chargeable to the 59 striking policemen should be apportioned equally so that each of the plaintiffs herein should be charged, not with ⅟₃₂nd of said damages, but with ⅟₅₉th portion thereof.

13. This cause is more than plaintiffs describe in their Second Amended Complaint as "an action at law". It is also a suit in equity, wherein he who seeks equity must do equity. Plaintiffs have not done equity. For up to ten days the plaintiffs undermined the public safety of the Village of Skokie by their deliberately insubordinate actions. These actions cannot be condoned, much less rewarded by money.

The Village of Skokie thus has a cause of action for damages against each of the plaintiffs. The Village of Skokie also has a cause of action for damages against each of the other 59 policemen who engaged in the illegal strike, but they are not before this court. Therefore it remains within the discretion of the Village of Skokie as to whether it should take any action to recoup damages from the 27 policemen who engaged in the illegal strike and who are not parties to this cause.

■ 14. As the result of defendants having deprived the plaintiffs of due process and of equal protection under the laws, defendants should reinstate all of the plaintiffs herein, retroactively to July 4, 1975, with full rights to all seniority, back pay, other benefits, and any and all increases of pay they otherwise would have received and to which they would have been entitled had they never been discharged.

There should be deducted from the above monetary benefits the amount of said plaintiffs' salaries for the 10 days, commencing July 4, 1975, which said plaintiffs spent engaging in an illegal strike. There should also be deducted from the above monetary benefits, said plaintiffs' pay for 30 days during which they were suspended.

Further, there should be deducted from the above monetary benefits the setoff of damages in the sum of $3,423.80 which should be charged to each of said plaintiffs for his proportionate share of damages due to the Village of Skokie as the result of the alleged strike in which said plaintiffs and the other striking policemen engaged.

■ 15. The expenses of $23,125.30 in attorneys' fees incurred by the Village of Skokie due to the policemen's illegal strike, cannot be charged to the 59 striking policemen or any of them. The common law rule in this country is that, absent statutory authority to the contrary, attorney's fees must be borne by each litigant. *Alyeska Pipeline Service Co. v. Wilderness Soc'y*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Illinois common law is to the same effect. *Trust Co. v. National Surety Corp.*, 177 F.2d 816, 818–819 (7th Cir. 1949).

16. Total damages chargeable to the 59 striking policemen and awardable to the Village of Skokie are $159,297.00 in excess payroll expenses, plus $42,707.15 in other Village expenses (but not including attorneys' fees), making a total of $202,004.15 in damages which are chargeable to the 59 striking policemen. Thus the damages chargeable to each of the 59 striking policemen are $202,004.15 divided by 59, or $3,423.80 for each of the 59 striking policemen.

The Village of Skokie should therefore be allowed from each of the 32 plaintiffs herein $3,423.80 in damages in the nature of a setoff against back wages due to them.

■ 17. Any plaintiff who received unemployment compensation from the State of Illinois since July 4, 1975 should

have the total amount of said unemployment compensation withheld by the Village of Skokie from the amount due said plaintiff, and said total amount of unemployment compensation should be paid over by the Village of Skokie to the State of Illinois as reimbursement for said unemployment compensation paid to said plaintiff.

18. The Village of Skokie should also be entitled to deduct from the aforesaid back pay,—as mitigation of damages,—such sum as any plaintiff has received from full-time employment between July 4, 1975 and January 31, 1976.

19. Payments of back pay due hereunder should be payable as of March 1, 1976, without interest prior to that date; but if not paid on said date, said payments of back pay should bear interest at the rate of 5% per annum until paid. Said payments of back pay should be made no later than July 1, 1976.

20. The net amount due to each plaintiff, computed as aforesaid, should be the basis for withholding State and Federal income taxes.

Where applicable, any finding of fact herein shall stand as a conclusion of law and any conclusion of law herein shall stand as a finding of fact.

### DECREE

This cause came on to be heard by the court without a jury and the court having this day entered, simultaneously herewith, its Findings of Fact and Conclusions of Law herein, pursuant to and in accordance therewith,

It is hereby ORDERED, ADJUDGED and DECREED as follows:

1. That defendants Village of Skokie, the Skokie Board of Fire and Police Commissioners, Ben Pastko, William Elliott, Max Rabin and Kenneth B. Chamberlain forthwith revoke, vacate and set aside their orders and actions discharging each of the plaintiffs, Charles W. Olshock, Harry Redmond, Jimmy Anglin, Thomas Banner, Herman Carter, Steven Chelby, Fred Dosch, John Ersfeld, Jr., Eugene Gaiser, Roger Garcia, Mitchell Halyckyj, Robert Hanson, James Hart, Jr., Robert Heelan, William Jahn, John Kielczynski, Al Kurth, Thomas McEnaney, John Hammond, Warner Nuspl, Richard Oldenburg, Bruce Rappe, John Ryan, Stanley Schultz, Edward Trob, Edward Benoit, John O'Malley, Leonard Ramirez, Edward Rizer, James M. Chwalisz, Terry Proudfit, and Robert Jones. It is further ordered, adjudged and decreed that said defendants substitute in lieu of said orders and actions, discharging each of said plaintiffs, an order suspending each of the plaintiffs for a period of thirty (30) days without pay unless the defendants in their own discretion, based upon the records of the hearings heretofore held for each plaintiff and without further hearing, shall suspend one or more of the plaintiffs without pay for a lesser time.

2. That the defendants shall reinstate all of the plaintiffs with full rights to all seniorities and benefits they would have had if they had never been discharged, including back pay from July 4, 1975 to the date of reinstatement, together with any and all increases of pay they would have otherwise received, less the amount of their salaries for the period of ten (10) days, beginning on July 4, 1975, when they did not work but were off duty on protest, and less pay for the thirty (30) days suspension period and less the set-off of damages of $3,423.80 that has been found due from each plaintiff for his proportionate share of damages caused by the plaintiffs and others jointly to the Village of Skokie.

3. That each plaintiff shall give a statement under oath of any and all full-time employment that he has had since July 4, 1975, including his net income after withholding of State and Federal taxes.

4. That the Village of Skokie shall be entitled to deduct such sum as any plaintiff has received from full-time employment between July 4, 1975 and January 31, 1976 from the back salary due to such plaintiff as mitigation of damages before making payment to such plaintiff of back salary due to him.

5. That each plaintiff shall make an affidavit as to whether he did or did not receive payment of unemployment compensation from the State of Illinois since July 4, 1975, and if any payment or payments were received, a plaintiff shall state the amount thereof. If a plaintiff did receive payment or payments, as aforesaid, the total amount thereof shall be withheld by the Village of Skokie from the amount paid the plaintiff and said amount shall be paid over by the Village to the State of Illinois as reimbursement for the unemployment compensation paid the plaintiff. Each of said plaintiffs who received unemployment compensation is ordered and directed to authorize the Village of Skokie to make such payment in reimbursement to the State of Illinois on his behalf.

6. That payments of back salaries due hereunder shall be payable as of March 1, 1976 without interest prior to that date, but if not paid on that date said back salary payments shall bear interest at the rate of five (5) percent per annum until paid. Said payments shall be made no later than July 1, 1976.

7. That the net amount due to each plaintiff, by computing the amount as aforesaid, shall be the basis for withholding State and Federal taxes.

8. That each of the parties shall bear his or its respective costs herein.

9. That this court reserves jurisdiction for the purpose of enforcing or modifying the terms and conditions of this Decree.