Charles W. OLSHOCK et al., Plaintiffs-
Appellees, Cross-Appellants,

v.

VILLAGE OF SKOKIE et al., Defendants-
Appellants, Cross-Appellees.

Nos. 76–1153, 76–1191.

United States Court of Appeals,
Seventh Circuit.

Argued June 11, 1976.

Decided Sept. 17, 1976.

Robert DiLeonardi, Des Plaines, Ill., Gilbert Gordon, Harvey Schwartz, Chicago, Ill., for defendants-appellants.

Robert Tingler, Robert Krajcir, Gerald Bender, Chicago, Ill., for plaintiffs-appellees.

Before SWYGERT, SPRECHER and WOOD, Circuit Judges.

PER CURIAM.

In 1971 the Village of Skokie, Illinois, a municipality of about 68,000 persons located northwest of Chicago, entered into a collective bargaining agreement with the Combined Counties Police Association as the bargaining agent for all of its approximately 96 police patrolmen. At the last negotiating session on June 27, 1975, for the fiscal year beginning May 1, 1975, a bargaining impasse was reached. The association thereupon decided to conduct a "uniform protest" which was to consist of reporting for work at the normal time out of uniform and remaining available for work out of uniform throughout the shift.

The uniform protest began at midnight on July 3, and ended July 13, 1975. Fifty-nine patrolmen members of the association participated as their various shifts were to commence. The Rules and Regulations of the Police Department of the Village of Skokie require the wearing of full uniform and require obedience to direct orders. When the 59 protestors reported at their respective roll calls, they were ordered to put on their uniforms and, failing to do so, were placed on no-pay status and ordered to leave the premises. They would leave the building but remain on the parking lot outside of the police station throughout their shift.

A small number of patrolmen returned to uniform duty after one to six days of protest, but most of them reported back on either July 13 or 14. During the course of the protest, almost all of the police officers participating had been charged with failure to report in uniform and refusing to change into uniform when directly ordered to do so, under Ill.Rev.Stat., ch. 24, § 10–2.1–17 (1975). Hearings were conducted before the Board of Fire and Police Commissioners on fourteen days or evenings over the period of July 14 to September 13, 1975.

Of the 59 policemen who participated in the "uniform protest," two of them resigned from the force. Of the remaining 57, two were never charged with any regulation violations, one was found not guilty, 20 were suspended for various numbers of days and 34 were discharged. Of those suspended, three were suspended for 30 days, 11 were suspended for 25 days, three for 15 days, two for six days and one for two days.

Thirty-two of the 34 discharged patrolmen brought this action, alleging deprivation of rights under the First, Fifth and Fourteenth Amendments to the Constitution, and under 42 U.S.C. §§ 1983 and 1985. Trial commenced on September 10, 1975 and concluded on January 21, 1976. Findings of fact, conclusions of law and a decree were entered by the district court on February 4, 1976. *Olshock v. Village of Skokie,* 411 F.Supp. 257 (N.D.Ill.1976).

The district court reinstated all of the plaintiffs with back pay from July 4, 1975 to the date of reinstatement less the following amounts: (1) each plaintiff's salary for the ten days he was off duty on protest; (2) each plaintiff's salary for a maximum suspension period of 30 days (unless the defendants in their discretion reduced the suspension period in the case of any individual patrolman); (3) damages of $3,423.80, which was 1/59th of the Village of Skokie's excess payroll and other expenses resulting from the uniform protest in the total amount of $202,004.15; (4) all amounts received from full-time employment between July 4, 1975 and January 31, 1976; and (5) all amounts received as unemployment compensation from the State of Illinois (which amounts shall be repaid by the Village of Skokie to the State of Illinois). Back salaries were payable as of March 1, 1976 without interest prior to that date but were to bear interest of 5 per cent per annum from that date until paid.

The defendants, the Village of Skokie, the Board of Fire and Police Commissioners

of the Village, the three individual members of the board, and the Village Chief of Police, appealed from the February 4, 1976 decree. The plaintiffs cross-appealed from that portion of the decree which directs an offset or deduction of $3,423.80 per plaintiff.

## I

At the outset, we make it clear that the plaintiffs' actions in failing to report in proper uniform and in refusing to change into uniform when directly ordered to do so by their superior officers were in violation of Rules and Regulations of the Police Department of the Village of Skokie and under Illinois law would be cause for removal or discharge. The Supreme Court of the United States, in holding in *Kelley v. Johnson,* 425 U.S. 238, 248, 96 S.Ct. 1440, 1446, 47 L.Ed.2d 708 (1976), that a county regulation limiting the length of a policeman's hair did not violate any right guaranteed to policemen by the Fourteenth Amendment, said:

> The overwhelming majority of state and local police of the present day are uniformed. . . . This choice [that similarity in appearance of police officers is desirable] may be based on a desire to make police officers readily recognizable to the members of the public, or a desire for the *esprit de corps* which such similarity is felt to inculcate within the police force itself. Either one is a sufficiently rational justification for regulations so as to defeat respondent's claim based on the

liberty guaranty of the Fourteenth Amendment.

Inasmuch as the Skokie regulations were rationally justified, their violation would create "cause" for removal or discharge under the applicable Illinois Statute. Ill.Rev. Stat., ch. 24, § 10–2.1–17 (1975).[1] The plaintiffs recognize this fact in one of their briefs when they concede that they do not "expect a favorable decision to in any way indicate approval of their protest actions."

## II

However, we are confronted with another constitutional problem which arises out of the defendants' conduct of the "fair and impartial hearing" required by § 10–2.1–17.

In *Bishop v. Wood,* —— U.S. ——, ——, 96 S.Ct. 2074, 2078, 48 L.Ed.2d 684 (1976), the Supreme Court, in holding that a Marion, North Carolina, ordinance which had been interpreted as a matter of state law as permitting the discharge of a city policeman "at the will and pleasure of the city" did not create a property interest sufficient to invoke constitutional protection, said:

> A property interest in employment can, of course be created by ordinance, or by an implied contract.[2] In either case, however, the sufficiency of the claim of entitlement must be decided by reference to state law.[3]

As the Court recognized in *Bishop,* six justices in *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), concluded that "because the employee could only be

---

**1.** Nor can plaintiffs' actions be considered "partial strike activities" pre-empted by federal labor law against state regulation (*see Lodge 76, Machinists v. Wisconsin Employment Relations Commission,* —— U.S. ——, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976)), inasmuch as Illinois law prohibits municipal employees, including police officers, from striking against their employer. *Board of Education v. Redding,* 32 Ill.2d 567, 571, 207 N.E.2d 427, 430 (1965); *Fletcher v. Civil Service Comm.,* 6 Ill. App.3d 593, 286 N.E.2d 130 (2d Dist.1972).

**2.** · In *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972), the Court said that a "person's interest in a benefit is a 'property' interest for due process purposes

if there are . . . rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing."

**3.** In *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), the Court said:

> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law— rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

discharged for cause, he had a property interest which was entitled to constitutional protection," thus distinguishing *Bishop* from *Arnett*, —— U.S. ——, at n.8, 96 S.Ct. 2074.

We look then to the Illinois statute which provides that "no officer or member of the fire or police department of any municipality . . . shall be removed or discharged except for cause, upon written charges, and after an opportunity to be heard in his own defense" and "[t]he board of fire and police commissioners shall conduct a fair and impartial hearing of the charges . . . ." Ill.Rev.Stat., ch. 24, § 10–2.1–17 (1975).[4] In interpreting this statute, as applied to the dismissal of a village fireman, the Illinois Appellate Court said in *Dendor v. Board of Fire and Police Commissioners,* 11 Ill.App.3d 582, 588–589, 297 N.E.2d 316, 321 (1st Dist.1973):

> We begin with the premise that although a public employee does not have a constitutional right to such employment, he cannot be barred or removed from that employment arbitrarily or in disregard of his constitutional rights. (*Fort v. Civil Service Commission of County of Alameda* (1964), 61 Cal.2d 331, 38 Cal. Rptr. 625, 392 P.2d 385.) It can be said with equal certainty that acceptance of public employment is not an abandonment of constitutionally protected rights. (Citations omitted.)

The Illinois Supreme Court has held that "[t]he authority given the Board of Fire and Police Commissioners to remove only for cause is not an arbitrary one, but is to be exercised on just and reasonable grounds." *Fantozzi v. Board of Fire and Police Commissioners,* 27 Ill.2d 357, 360, 189 N.E.2d 275, 277 (1963). The Illinois Appellate Court reversed the Board of Fire and Police Commissioner's discharge of a fireman, who had left headquarters without permission, on the ground that "in view of the unprofessional working conditions of this fire department, we find it difficult to believe that . . . [leaving without permission] constitute[s] 'good cause' for the discharge . . . [inasmuch as] firemen were often away from their posts of duty for short periods." *Smith v. O'Keefe,* 9 Ill.App.3d 814, 823, 293 N.E.2d 142, 149 (5th Dist.1973).

The Supreme Court recently held in *Hortonville Joint School District v. Hortonville Education Ass'n,* —— U.S. ——, ——, 96 S.Ct. 2308, 2314, 49 L.Ed.2d 1 (1976), that the members of a school board which discharged teachers who had gone on strike in direct violation of Wisconsin law, were not disqualified inasmuch as:

> [A] decisionmaker [is not] disqualified simply because he has taken a position, even in public, on a policy issue related to the dispute, in the absence of a showing that he is not "capable of judging a particular controversy fairly on the basis of its own circumstances."

The Court recognized, however, that disqualification would result if "the Board members had some personal or official stake in the decision" or "the Board has manifested some personal bitterness toward the . . . [accused] . . . ."

---

4. The entire first paragraph of § 10–2.1–17 reads:

> Except as hereinafter provided, no officer or member of the fire or police department of any municipality subject to this Division 2.1 shall be removed or discharged except for cause, upon written charges, and after an opportunity to be heard in his own defense. The board of fire and police commissioners shall conduct a fair and impartial hearing of the charges, to be commenced within 30 days of the filing thereof, which hearing may be continued from time to time. In case an officer or member is found guilty, the board may discharge him, or may suspend him not exceeding 30 days without pay. The board may suspend any officer or member pending the hearing with or without pay, but not to exceed 30 days. If the Board of Fire and Police Commissioners determines that the charges are not sustained, the officer or member shall be reimbursed for all wages withheld, if any. In the conduct of this hearing, each member of the board shall have power to administer oaths and affirmations, and the board shall have power to secure by its subpoena both the attendance and testimony of witnesses and the production of books and papers relevant to the hearing.

In *Mank v. Board of Fire and Police Commissioners,* 7 Ill.App.2d 478, 484, 288 N.E.2d 49, 53 (5th Dist.1972), in holding that under § 10–2.1–17, the requirements of a fair and impartial hearing were not satisfied where one of the commissioners was the father of the police chief who brought the charges against the officer, said:

> Bias and prejudice is an illusive condition of the mind and it may even unconsciously exist in the person who would sincerely contend that he has no bias or prejudice. The function of the Board of Fire and Police Commissioners is judicial to determine whether or not the charges were true and *whether or not the charges were sufficiently severe to warrant a discharge.* The testimony offered here was conflicting and . . . raised a number of credibility issues. Relationship by blood is sufficient to disqualify a judge in hearings . . . and the commissioners here were "judges in the full sense of the word." (Emphasis added.)

### III

Thus, the Illinois statute as interpreted by Illinois Courts has created a property interest in employment entitled to constitutional protection under *Bishop* and *Arnett,* although under the circumstances of this case no liberty interest existed in accordance with *Kelley.*

The district court here held lengthy and voluminous hearings. The court made detailed findings and conclusions. 411 F.Supp. 258–268. We have examined the record below and find those findings and conclusions not "clearly erroneous." F.R. Civ.P. 52(a).

The only discernible pattern of treatment of the 54 police officers who were disciplined is that the 34 who were discharged appeared with an attorney and the 20 who were suspended appeared without an attorney. 411 F.Supp. at 260.

Any other purported pattern of treatment does not survive close analysis. All 54 of those disciplined agreed to engage in the uniform protest (A. 4a), all of them participated in the protest, all of them were members of the police association (A. 10a), all of them pleaded not guilty[5] to the charges against them (A. 4a), and all of them stipulated as to the facts of what occurred (A. 13a). All of them were charged with the same offenses on substantially the same days.

At the outset there are some unexplained facts. Two officers, Markoutas and Kruscynski, who participated in the protest and were in the same category otherwise as the 54 disciplined, were not even charged. (A. 3a.) Markoutas had even urged a reluctant officer to join the protest and the latter was discharged. (T. 2066–2067.) The officer (Trombatore) who first brought up the subject of some protest action, who first brought up the possibility of a full-out strike, who first suggested the possibility of speeding up arrests and issuing of tickets and who first suggested the uniform protest (A. 14a; T. 1203) was not discharged nor even suspended for the maximum 30 days. Another officer (Warrington) who had urged a full strike and was more outspoken than others about participating in a job protest, was not discharged but was only suspended for 15 days. (A. 14a; T. 801.)

The district court found that:

> 13. The evidence upon which the plaintiffs herein were found guilty and then discharged was identical to the evidence to which all the other policemen stipulated and upon which all the other policemen were found guilty and then merely suspended without pay for specific periods of time. The plaintiffs herein did not contest the same facts that were stipulated to by the other officers and they offered no evidence whatsoever to contradict said facts.

411 F.Supp. at 260.

The record contains the length of service and the service record of almost all of the 54 disciplined officers and there appears to be no correlation between the severity of

---

**5.** Or at least did not plead guilty, which amounts to a "not guilty" plea. Many of those who were discharged were not asked by the Board or prosecutor how they pleaded.

punishment meted out and length of service or quality of that service. Some of the discharged plaintiffs had long service records and extremely commendable records. For example, officer Olshock had over ten years service, ten police department commendations and 20 letters from appreciative citizens (Board Hearings, 894–896, 913–914); officer Anglin had over ten years service (A. 1a) and ten letters of commendation based on citizens' reactions to the quality of his police service. (Anglin Ex. 1.)

The defendants have attempted to argue that all the men who returned up to and including July 13, 1975, were only suspended whereas the 34 who returned on July 14, 1975 were discharged. On July 13, the police association counsel had advised the men to return to work inasmuch as he had been told by a village representative that if they would end the strike no one would be fired. (A. 10a.) When the men agreed to return, the association counsel reported that fact to the chief of police and said the men would report at the 7:00 a. m. o'clock shift on July 14, to which the chief replied that they should "come back as soon as possible." (A. 24a–25a.) Nowhere does the record or the findings indicate that the discharged men were advised by anyone that July 13, was a crucial deadline between future professional life and death.[6] And, in fact, the "deadline" was not actually adhered to: plaintiffs Prondfit, Jones and Carter reported on the 13th and were told by their supervising officer to come back on the 14th (Finding 9, 411 F.Supp. at 259); officers DeGusto, McLaughlin and Quante were suspended only, despite the fact that they returned on the 14th. (Finding 18, *Id.* at 261.) The only apparent reason these six received different kinds of punishment is that the three

returning on the 13th had attorneys for their disciplinary hearings and were discharged, whereas the three returning on the 14th had no attorneys[7] and were suspended (Findings 11 and 12, *Id.* at 260).

There is no pattern of severity of discipline discernible by any other rational test. The Board's question "would you do it again?" was not asked of eight of those suspended, received varying answers from the other members of the suspended group, and was not asked of 27 of the discharged men. The record and findings abound with total inconsistency except as described in Findings 11 and 12 (411 F.Supp. at 260):

11. Except for the plaintiffs herein, all of the policemen who on or after July 3, 1975 and until July 14, 1975, had withdrawn their services as police officers in uniform, appeared for trial at administrative disciplinary hearings conducted by the defendant Board and, although pleading "technically not guilty", signed stipulations of fact wherein they admitted that they had refused to perform their duty in uniform and that they had disobeyed orders to put on their uniforms and perform their duties therein. These policemen were found guilty and were suspended from duty without pay for specific periods of time. Before they were suspended, said policemen had stated that they would not be represented by counsel for the Union (Mr. Burpo), or by other counsel; and in fact they were not represented at their hearings by any counsel; they appeared *pro se* and in the record waived their right to any counsel after they were asked if they desired to have counsel.

12. Plaintiffs herein all refused to enter into the arrangement described in paragraph 11 above. Rather, they chose

---

6. The Chief of Police who had issued virtually identical notices of charges to the 54 disciplined men, had on July 16, 1976, "recommended" to the Board that all men who returned on July 14, be discharged and that all men who returned on or before July 13, be suspended only.

7. Quante had no attorney until he was found guilty by the Board, after which he appeared at

his mitigation hearing with a non-union attorney. (Finding 18, 411 F.Supp. at 261.) Officers Hanline and Lowen were represented by the union attorney at the outset of their hearings but when they discovered the semi-secret formula of success they discharged their attorney, but they were too late and were discharged rather than suspended. (Finding 19, *Id.* at 261.)

to be represented by counsel, to plead not guilty, and to go to trial. All plaintiffs herein were tried, were found guilty, and were discharged.

The 34 who were discharged received virtually the same form of "Findings and Decision" by the Board and the 20 who were suspended received substantially the same form except that the last paragraph ordered suspension rather than discharge.

It seems obvious that contrary to Illinois statute as interpreted by the Illinois courts and contrary to the due process and equal protection clauses of the Fourteenth Amendment, the defendant board and its individual members acted in a wholly arbitrary manner in purporting to distinguish between suspension and discharge. Actually, they were distinguishing between employing or not employing counsel to represent the protest participants. This was a suspect classification for which they failed to show a compelling need.

IV

■ In regard to damages, the district court was struggling conscientiously to do justice in view of the two countervailing pressures which we have discussed in Parts I and II of this opinion: the illegality of plaintiffs' protest action and the arbitrariness of defendants' reaction to that protest. Back pay is a remedy for employment discrimination and like most remedies is largely in the discretion of the district court. *Johnson v. Railway Express Agency,* 421 U.S. 454, 460, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 414–425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

The unusual circumstances of this case called for a Solomon-like approach by a chancellor and that is what the district court endeavored to apply. We cannot say that he was clearly wrong.

The district court's judgment of February 4, 1976, is affirmed in its totality as against both the appeal and the cross-appeal.

AFFIRMED.

HARLINGTON WOOD, Jr., Circuit Judge (dissenting).

Being unable to join in the majority opinion, I respectfully dissent.

The action by the plaintiffs, policemen of the Village of Skokie, which gave rise to this controversy may mildly be labeled a protest, but was, as the district judge so found, an illegal strike. The district court found that this illegal strike, together with the related acts and circumstances which were aided and abetted by plaintiffs "brought about a state of government chaos, a complete disruption of the orderly management of municipal matters and a near breakdown in law enforcement,—all resulting in a most serious threat to the safety and welfare of some 68,000 citizens and residents of the Village of Skokie." The court also found that this illegal strike caused the Village of Skokie to lose close to a quarter of a million dollars in damages. The district court further found that all plaintiffs were advised in advance "and well knew thereafter that a strike by policemen is illegal in Illinois." Even the plaintiffs in their brief reveal that they have no expectation of approval of their "protest" actions by this court. The majority recognize that the actions of plaintiffs constituted a basis for discharge from their public employment.

Contrasted with the acts of plaintiffs, the district court found that in this "emergency situation" produced by the illegal strike, "all of the defendants, however, acted in good faith at all times and under most trying circumstances. None of said defendants acted with any malice whatever toward any of the plaintiffs or other policemen involved in the strike. The conduct of the defendants has been beyond reproach. * * * Despite the most adverse circumstances, they exercised calm and good judgment and tolerated unwarranted abuse and threats cast upon them by persons in sympathy with the illegal strike."

Against this background the trial court found as to the hearings which were held by the Board that:

15. "In each instance resulting in the discharge of the plaintiffs herein, the Board held hearings upon written charges filed by Chamberlain, Chief of Police of the Village of Skokie, as to each of the plaintiffs. The Board issued separate written findings and decisions which, in addition to the specific findings of guilt as to particular acts, determined that cause existed for the discharge of each of said plaintiffs."

and also that:

33. "At his Board hearing, each plaintiff received adequate opportunity to present an argument, a statement, or other evidence in mitigation of disciplinary action prior to the time the Board meted out ultimate disciplinary action against him.

"Plaintiffs Proudfit and Jones, even though not the recipients of what they term 'separate mitigation hearings', were nonetheless given the aforesaid opportunity in the hearing process wherein said plaintiffs were permitted to, and did, present evidence explaining by way of mitigation, the circumstances and motivation for their actions."

Some of the strikers received "notice," more correctly designated as mere information, that if they terminated the strike and reported for duty in uniform on or prior to July 13, 1975, they would not be discharged. This notice or information, which some, but not all of the striking policemen received, was found by the district court to be a violation of equal protection of the laws and due process. It was also found that plaintiffs were deprived of equal protection by being discriminated against for exercising their right to counsel and for contesting the matter of their guilt. The district court then concluded that discipline was unequally and intentionally applied in an unreasonably discriminatory manner in violation of their right to equal protection.

The majority affirms these conclusions of constitutional violations, finding the defendant Board acted in a wholly arbitrary manner in only suspending some and discharging others.

I cannot agree with those conclusions drawn from this record.

As to the problem about notice relating to the date to return to work in uniform so as to avoid discharge, no notice of any kind was necessary as the plaintiffs were engaged in a strike known by them to be illegal which could result in their discharge. The evidence shows that the so-called notice resulted from individual inquiries to the Assistant Chief by some of the strikers. The Assistant Chief advised those who asked that "if they would come back to work before the 14th, [he] would try to save their job for them. (Tr. 619) It does not appear that there was any effort to limit this information which was available to any plaintiff who chose to inquire. In addition, the Chief of Police testified that he had a conversation with the Union attorney representing plaintiffs and advised him to "Return them [the men] immediately. Do not wait." (Tr. 446) Plaintiffs' attorney responded that the plaintiffs would not comply with that request as they were going to have a celebration on the night of July 13, 1975, and that therefore plaintiffs would not return until July 14. I can find no merit in a constitutional violation involving notice under these circumstances.

The majority agrees with the trial court and finds that the only discernable pattern distinguishing between plaintiffs who were all discharged and those who were only suspended is that plaintiffs were represented by counsel at the Board hearings. The majority concludes that plaintiffs were penalized for asserting their right to be represented by counsel and that their right to equal protection and due process was thereby violated.

There is some justification in the analysis, but that analysis does not fully square with the trial court's own finding that:

5. "Defendant Board members concluded that they should discharge all of the policemen who continued to be represented by their Union attorney, Mr. John Burpo. Said members determined that, in order to preserve discipline within and to require loyalty to the Skokie Police

Department, they could not and would not allow either Attorney Burpo or the Union to dictate whether or when the striking policemen should abandon their strike and return to work."

The matters of discipline and loyalty of police officers are legitimate concerns and the Board need not accede to someone else's determination as to if and when the illegal strike should be terminated. Thus, it is not that plaintiffs were penalized for merely having an attorney, union or otherwise, but that they followed his bad advice and did not terminate their illegal strike forthwith and return to work. If the plaintiffs chose to follow such advice and persist in their illegal activities, the Board was not required to overlook the results and consequences of that advice as it affected the actions of plaintiffs simply because it was given to plaintiffs by their attorney.

I agree with the majority's implication that this is a difficult case to fairly resolve, and that the trial court made a Solomon-like effort. I do not believe, however, that this record is sufficiently clear to justify for constitutional reasons the intervention of a federal court into the solution of this local problem of utmost importance to the welfare of that community after Village officials made a good faith and satisfactory effort to resolve it for themselves. I do not believe that we should now substitute our judgment for theirs in the administration of their Police Department under the circumstances we find here. I would not require the community to rehire those law enforcement officers who were discharged because of involvement in the illegal strike. If the Board in its judgment in individual cases desires to keep some of the dissidents, I would view that as its business under the circumstances. It is true that the exercise of the Board's judgment in some instances was uneven, but I do not believe that justifies our now trying to look over its shoulder, measure its conduct against an imprecise constitutional standard, and substitute a solution based on inference which neither party is totally satisfied with.

The Board is a body of lay persons and is not a court presided over by a judge presumably having above average knowledge of constitutional safeguards. However, even in ordinary courtroom circumstances, as Judge Stevens, now Justice Stevens, said in dissenting in a criminal case where a person's liberty was at stake, "almost every jury trial requires some compromises with standards of absolute perfection; such deviations must be tolerated if the jury system is to function effectively." *United States v. Thomas*, 463 F.2d 1061, 1066 (7th Cir. 1972).

*Snowden v. Hughes*, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1943), involved the actions of a state board which allegedly failed to certify correctly the results of a primary election, depriving plaintiff of election to the State Assembly and resulting in a violation of the plaintiff's Fourteenth Amendment rights. The Court commented:

The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination. This may appear on the face of the action taken with respect to a particular class or person, cf. *McFarland v. American Sugar Co.*, 241 U.S. 79, 86–7, [36 S.Ct. 498, 501, 60 L.Ed. 899] or it may only be shown by extrinsic evidence showing a discriminatory design to favor one individual or class over another not to be inferred from the action itself, *Yick Wo v. Hopkins*, 118 U.S. 356, 373–4, [6 S.Ct. 1064, 1072, 1073], 30 L.Ed. 220. But a discriminatory purpose is not presumed, *Tarrance v. Florida*, 188 U.S. 519, 520, [23 S.Ct. 402, 403, 47 L.Ed. 572]; there must be a showing of "clear and intentional discrimination," *Gundling v. Chicago*, 177 U.S. 183, 186, [20 S.Ct. 633, 635, 44 L.Ed. 725]; see *Ah Sin v. Wittman*, 198 U.S. 500, 507–8, [ 25 S.Ct. 756, 758, 759, 49 L.Ed. 1142]; *Bailey v. Alabama*, 219 U.S. 219, 231, [31 S.Ct. 145, 147, 55 L.Ed. 191].

I do not believe that this record sustains a finding of "clear and intentional discrimi-

nation" by the Board. The selection of which officers were to be discharged and which were to be only suspended was not based upon an unjustifiable standard such as race, religion, or other arbitrary classification. *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962); *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

The mere fact that similarly situated individuals are treated more leniently does not demonstrate intentional or purposeful discrimination. In *Herzbrun v. Milwaukee County,* 504 F.2d 1189 (7th Cir. 1974), a public employee suspension and discharge case, this court noted at page 1196 that:

> Mrs. Herzbrun, individually, claims that her discharge, in contrast with the suspension of others, denied her equal protection of the laws. We are unable to find that the difference in treatment was outside the broad range of discretion of the county officers.

Likewise, I believe the Village officials are entitled to a broad range of discretion in these matters of critical public concern and I do not believe the record shows the differences in treatment were outside the permissible range of discretion.

The burden of proof was on plaintiffs and I do not believe they sustained that burden.

I would reverse the judgment in favor of plaintiffs and deny plaintiffs' cross appeal.